UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:05-CR-10213-NMG |
| | ) | |
| | ) | |
| GEORGE L. MEDINA | ) | |

DEFENDANT'S MOTION TO SUPPRESS FRUITS OF
ILLEGAL SEARCH OF HOME AND STATEMENTS

Defendant, George L. Medina, moves this Court to suppress from the use in evidence

any and all evidence derived from the unlawful search of a residence at 15 Brook Street,

Haverhill by the Haverhill Police on March 10, 2005 and any and all evidence derived from his

illegal interrogation by the Haverhill Police on that date.

As grounds therefor, the search and interrogation were in violation of the Fourth and

Fifth Amendments to the United States Constitution in that the police searched a home without

a search warrant.  Such action constitutes a core violation of the Fourth Amendment.

STATEMENT OF FACTS: HAVERHILL POLICE

At approximately 11:00 a.m. on March 10, 2005, Detectives Rogers and Melanson,

along with Sergeant Arahovites and Lieutenant Dorr set out for 15 Brook Street in Haverhill.[1]

The police were looking for George L. Medina because they believed that there was an

outstanding warrant for his arrest.  Exhibit A.  The warrant, for failure to pay a fine and court

costs on an Operating a Motor Vehicle with a Suspended License case, was issued on November

---

[1]The facts in this section are taken from the Haverhill Incident Report #5005473, attached as
Exhibit A; the Application for Criminal Complaint, attached as Exhibit B; and a copy of Warrant for
George Medina, attached as Exhibit C.

3, 2004, four months prior to the police's excursion.  Exhibit C.  The police evidently did not confirm the existence or validity of the arrest warrant before they went in search of Mr. Medina, nor did they have a search warrant for 15 Brook Street.  Exhibit A.  The arrest warrant produced in discovery lists Mr. Medina's address as 45 Jackson Street in Haverhill.  Exhibit C.  Arriving at 15 Brook Street, the residence of Mr. Medina's girlfriend, Jacqueline Cruz, the police knocked on the door.  Exhibit A.  Ms. Cruz answered the door and the police told her that they were looking for Mr. Medina.  Id.  She told them that he was not in the house and, according to the application for a complaint, gave the police, "permission to look for the *defendant* in the residence."  Exhibit B.

The police found Mr. Medina on the basement floor, partially concealed by rags. Exhibit B.  At that point, the police called dispatch to verify the existence and validity of the arrest warrant.  Exhibit A.  Learning that the warrant was indeed valid, the police arrested Mr. Medina.  Id.  According to the police, they wanted to question Mr. Medina about a shooting, so they performed what they termed, "a security check...for any other parties that may attempt to aid in defendant's escape."  Id.  Rogers writes that Mr. Medina wanted to put a pair of shoes on and so the police lifted the seat cushion of a chair to ensure, "the detectives (sic) safety."  Id. Under the cushion was a pellet gun and six rounds of .22 caliber ammunition.  Id. The police subsequently recovered a box of ammunition located near the chair.  Id.  When Ms. Cruz brought Mr. Medina a pair of shoes, the police noted a .22 caliber bullet tied on one of the shoestrings.  Id.  Dorr "informed" Mr. Medina of his Miranda rights and Mr. Medina then, "admitted that the bullets were his" and also told the officers that he, "always carries six bullets in a bag, but does not know why."  Id.  According to Rogers, Mr. Medina also claimed

2

ownership of the box of ammunition, although maintaining that he, "had not touched them for a long time." Id.

## STATEMENT OF FACTS: MR. MEDINA AND MS. CRUZ

Mr. Medina and Ms. Cruz are boyfriend and girlfriend.[2] Exhibit D, ¶ 2. As he had on other nights, on the night of March 9, 2005, Mr. Medina stayed with Ms. Cruz at her residence at 15 Brook Street in Haverhill. Id. He was at that address when the police arrived on the morning of March 10. Id. On March 10, Ms. Cruz was summoned to her front door by a knock. Exhibit E, ¶ 3. She asked who was at the door, and the people on the other side of the door told her that they were there to do, "maintenance." Id. Ms. Cruz opened the door to find herself face to face the police, one of whom immediately wedged his foot between the door and the doorjamb. Id. at ¶ 4. Another officer pushed past Ms. Cruz and strode directly into the living room of her house. Id. One of the officers asked Ms. Cruz where "George" was, and she told him that she did not know. Id. at ¶ 5.

The same officer then asked Ms. Cruz if they could look for George. Id. Because one officer had already entered her home and circled the entire first floor, Ms. Cruz concluded that she had no choice but to permit the search, and she acquiesced to the police's request. Id. Ms. Cruz did not give the policemen consent to search for contraband. Id. The police commenced a search of the entire house. Meanwhile, Mr. Medina had gone to the basement, and then into a small utility room directly off of the main basement. Exhibit D, ¶ 3. A door separates the utility room from the main basement. Id. The utility room itself has an additional two doors, one of

---

[2] The facts in this section are taken from the affidavit of George Medina, attached as Exhibit D; and affidavit of Jacqueline Cruz, attached as Exhibit E.

which opens directly on to the backyard of the home.  Id. at ¶ 5.  Mr. Medina concealed himself

beneath some rags on the floor of the utility room.  Id. at ¶ 3.

Shortly after this evasive maneuver, the police entered the utility room and discovered

Mr. Medina.  The officers strode into the room, their guns drawn and pointed at him.  Id. at ¶ 4.

The police immediately handcuffed Mr. Medina and walked him into the main basement.  Id. at

¶¶ 5 & 6.  They sat Mr. Medina down on the stairs leading to the first floor of the apartment.  Id.

at ¶ 7.  With Mr. Medina secured on the stairs, the police commenced a general search of the

basement.  Id.  From upstairs, Ms. Cruz heard one of the police say, over his walkie-talkie, that

the officers needed a search warrant.  Exhibit E, ¶ 7.  Meanwhile, the police were exhaustively

scouring every corner of the basement, pulling down insulation from the ceiling and tossing

aside seat cushions from the furniture.  Exhibit D, ¶ 7.  Neither Mr. Medina nor Ms. Cruz

consented to this search.  Id. at ¶ 8; Exhibit E, ¶ 5.

While rummaging, the police peppered Mr. Medina with questions, including repeatedly

demanding, "[w]here is the gun, we know you have a gun!"  Exhibit D, ¶ 7.  Once they found

ammunition, which was tucked under the stairway and under a seat cushion, the police

interrogated Mr. Medina about the ammunition, and he responded to their questions.  Id. at ¶¶ 7

& 9.  The police had not advised Mr. Medina of his Miranda rights prior to any of this

questioning.  Id. at ¶ 9.

Ms. Cruz estimates that the police were in her basement for approximately ten minutes.

Exhibit E, ¶ 7.  At the conclusion of that time, the police returned Mr. Medina to the first floor

in handcuffs.  They told Ms. Cruz that they had found ammunition in the basement, and asked

her to get Mr. Medina a pair of shoes.  Id. at ¶ 8.  She complied, and Mr. Medina was removed

4

from her home.  Id.  Subsequent to Mr. Medina being removed from 15 Brook Street, a

detective and a uniformed police officer presented Ms. Cruz with a standardized consent to

search form.  Id. ¶ 9.  They informed her that if she signed it they would refrain from informing

the housing authority that George had stayed overnight at her home.  Id.  Fearing the

consequences of a refusal, Ms. Cruz signed the form.  Id.

### ARGUMENT

1.     MR. MEDINA HAD A LEGITIMATE EXPECTATION OF PRIVACY IN MS.
       CRUZ'S HOME AND HE IS ENTITLED TO CHALLENGE THE POLICE'S
       INVASION OF HIS PROTECTED FOURTH AMENDMENT INTERESTS.

       The Fourth Amendment provides that:

> "The right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and
> seizures, shall not be violated, and no Warrants shall issue,
> but upon probable cause, supported by Oath or affirmation,
> and particularly describing the place to be searched, and the
> persons or things to be seized."

Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citation omitted).  The, "capacity to claim the

protection of the Fourth Amendment depends...upon whether the person who claims the

protection of the Amendment has a legitimate expectation of privacy in the invaded place."

Minnesota v. Olson, 495 U.S. 91, 94 (1990) (quoting, Rakas v. Illinois, 439 U.S. 128, 143

(1978)).  An individual's, "subjective expectation of privacy is legitimate if it is, 'one that

society is prepared to recognize as reasonable.'" Olson, 495 U.S. at 95-96 (citing, Rakas, 439

U.S. at 143-44, n. 12).

       In Minnesota v. Olson, the Supreme Court definitively ruled that overnight guests have a

legitimate expectation of privacy in their host's home.  See, Olson, 495 U.S. at 96 ("We need go

no further than to conclude, as we do, that Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as legitimate."). Olson, 495 U.S. at 98; See also, United States v. Jimenez, 419 F.3d 34, 40 (1st Cir. 2005); United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004) (defendant who was a "fairly regular overnight guest" in a third party's apartment fell, "squarely within the rule that an overnight guest has a legitimate expectation of privacy in his host's abode.").

Mr. Medina and Ms. Cruz were involved in an intimate relationship. As a result of that bond, Mr. Medina was often a welcome overnight guest in Ms. Cruz's home, as he was on the evening of March 9, 2005, and continuing on into the morning of March 10. Because of his relationship with Ms. Cruz and her residence, Mr. Medina falls, "squarely within the rule" enunciated in Olson, and reiterated by Romain, that an overnight guest enjoys a legitimate expectation of privacy in his host's residence, which expectation entitles him to the protections of the Fourth Amendment while visiting there.

2.    THE WARRANTLESS SEARCH OF MS. CRUZ'S HOME WAS PER SE UNREASONABLE AND VIOLATED MR. MEDINA'S FOURTH AMENDMENT RIGHTS.

In the absence of valid consent or exigent circumstances, warrantless searches are *per se* unreasonable and violate the Fourth Amendment. Steagald v. United States, 451 U.S. 204, 211 (1981). Indeed, the Supreme Court has, "consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." Steagald, 451 U.S. at 211 (citing, Payton v. New York, 445 U.S. 573 (1980); Johnson v. United States, 333 U.S. 10, 13-15 (1948)).

6

In this case, the only warrant that the police possessed when they entered Ms. Cruz's home – *arguably*, since they note that they did not confirm its existence or validity until they had scavenged through the house in search of Mr. Medina – was an aged warrant for Mr. Medina's arrest for failure to pay a fine.  Steagald, however, clearly holds that an arrest warrant for a non-resident of a third party's home is insufficient to authorize a search of that home in the absence of valid consent or exigent circumstances.  Steagald, 451 U.S. at 217; See also, United States v. Curzi, 867 F.2d 36, 39 (1ˢᵗ Cir. 1989) (absent consent or exigent circumstances a search warrant is required before one's home can be searched for a third person).

Steagald rests on the recognition that arrest warrants and search warrants represent distinct findings by a magistrate, and that the differing significance of those findings defines the scope of the actions that the warrants authorize.  "An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure."  Steagald, 451 U.S. at 213.  A *search warrant*, on the other hand, represents a finding by a detached, neutral magistrate that there is probable cause to believe that the person or thing sought may be found in a particular place and it thus, "safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police."  Id.  The police's possession of an arrest warrant for a non-resident is patently inadequate to justify or serve as a basis for the search of a third party's home.  Steagald, 451 U.S. at 213-14; Curzi, 867 F.2d at 39-41.

Here it is uncontested that, *at best*, the police possessed an arrest warrant for Mr. Medina.  That warrant was utterly insufficient authorization to conduct a search of Ms. Cruz's

home, as at least one of the officers acknowledged when he used his walkie-talkie to request the required *search* warrant.  It is unavailing that the police may have had a reasonable suspicion, or even probable cause, to believe that Mr. Medina could be found at the 15 Brook Street address. That determination was not theirs to make:

> "Steagald requires not only probable cause that the subject of
> an arrest warrant is within the place to be invaded, but also
> that a neutral judicial officer make this determination and issue
> a search warrant.  *No such protocol was followed here*."

Curzi, 867 F.2d 36, 39 (emphasis added).

Because the police entry and search of Ms. Cruz's home were unlawful, all evidence seized during the search must be suppressed.  Wong Sun v. United States, 371 U.S. 471 (1963).

3.    MS. CRUZ'S ALLEGED CONSENTS TO THE POLICE'S ENTRY AND SEARCH
      WERE AN ACQUIESCENCE TO THEIR CLAIM OF LAWFUL AUTHORITY, THE
      PRODUCT OF COERCION, AND TAINTED BY THE UNLAWFUL SEARCH.

      A.    Alleged Consent by Ms. Cruz to original police entry was the product of mere
            acquiescence to claim of lawful authority and coercion.

Any attempt by the Government to rely on Ms. Cruz's alleged consent to the Haverhill police's initial entry into her residence is misplaced.  See Bumper v. North Carolina, 391 U.S. 543, 548 (1968)( government bears burden of proving that consent was, in fact, freely and voluntarily given).  Ms. Cruz's alleged consent to enter her apartment is the clear product of police misconduct, brute force, and intimidation on the part of the Haverhill police.  Moreover, as is discussed more fully below, the initial "consent" was limited to looking for Mr. Medina and did not grant permission to conduct a general search for contraband.  As the Supreme Court stated in Bumper, consent is not voluntary if it is merely the acquiescence to a claim of lawful authority."  Bumper, 391 U.S. at 548-49; See also, United States v. Perez-Montanez, 202 F.3d

434, 438 (1ˢᵗ Cir. 2000).  In determining whether consent was voluntary or the result of coercion the court must look to the following factors: age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics.  United States v. Marshall, 348 F.3d 281, 286; See also, United States v. Coraine, 198 F.3d 306, 309 (1ˢᵗ Cir. 1999).

Here, all of these factors mitigate against a finding that Ms. Cruz's consent to enter her apartment was anything other than the mere acquiescence of a young, scared woman to numerous male police officers forcing their way into her apartment.  First, at the time of the police entry Ms. Cruz was a 31 year old single mother of three young children.  She had minimal to no prior contact with law enforcement.  Second, the entry to Ms. Cruz's home was accomplished by officers who, by their conduct, conveyed the clear message that Ms. Cruz had no right to resist them.  Specifically, one officer prevented her from closing her door while a second drove home the message that she could not stop them by pushing past her into her living room.  Third, the coercive authority of the police remained on full display once the initial unlawful entry was accomplished in that the police immediately began searching Ms. Cruz's home prior to her even responding to the police request to search; thereby creating the impression that she in fact had no choice.

The facts of the instant case are similar to those in United States v. Weidul, 325 F.3d 50 (1ˢᵗ Cir. 2003).  In Weidul, several officers responded to the home of Trisha Malloch after her fiancé, Ernest Weidul, called the emergency room of the local hospital threatening to shoot himself in the head.  While the police were en route to Ms. Malloch's home, she called the station to notify them that Mr. Weidul had "passed out" and that the crisis was over.  United States v. Weidul, 325 F.3d 50, 52 (1ˢᵗ Cir. 2003).  Malloch met the officers outside of her home

9

and they brought her inside the house.  She cooperated with the police, telling them where Weidul was.  She denied that there was a gun in the home, but did not protest when the authorities entered.  Id.  The police found Weidul in an upstairs bedroom and trundled him off to the emergency room via a waiting patrol car.  Meanwhile, they had spotted a box of .22 caliber ammunition.  Id.  After dealing with Weidul, three policeman re-entered Malloch's home where they found her seated in her living room chair, talking to a police captain and a fifth officer.  The captain instructed his colleagues to conduct a search to ensure that there were no weapons in the house.  Weidul, 325 F.3d at 52-53.  Malloch made no objection and the police fanned out through her home.  One officer asked for Malloch's consent each time he entered a new room.  Entering her kitchen he received no response to his request for consent, but continued on notwithstanding her silence.  Telling Malloch that he was going into her laundry room next prompted her to respond, "okay."  Id.  It was there that a .22 caliber handgun, for possession of which the felon Weidul was ultimately indicted, was found.  Id.

The District Court suppressed the evidence finding that Malloch had merely acquiesced to conduct, "'tantamount to a claim of lawful authority to search for weapons.'"  Weidul, 325 F.3d at 54 (quoting, United States v. Weidul, 227 F.Supp.2d 161).  The instant facts are even more egregious than those in Weidul.  Here, unlike Weidul, the initial consent given by Ms. Cruz was to search for Mr. Medina not to conduct a more full blown search for contraband.  In addition, while the police in Weidul at least made a pretense of consulting Ms. Malloch about her wishes as they searched throughout her home, in this case the police simply did as they pleased in Ms. Cruz's home, never consulting her for approval of their actions.  Clearly, the totality of the

circumstances lead inexorably to the conclusion that Ms. Cruz's assent to the police entry was nothing more than a capitulation to police authority.

Moreover, even if Ms. Cruz's initial consent to allow the police into her home was valid, the officers' search exceeded the scope of that consent. "When an official search is properly authorized – whether by consent or by the issuance of a valid warrant – the scope of the search is limited by the terms of its authorization." Walter v. United States, 447 U.S. 649, 656 (1980). In this case, by *all parties'* accounts, the scope of the authority granted to the police by Ms. Cruz limited the search to those areas in which a person might be found. Mr. Medina was the, "expressed object" of the search. Jimeno, 500 U.S. at 251 (citing, United States v. Ross, 456 U.S. 798 (1982)). The police assert that they went to the Cruz residence in order to arrest Mr. Medina on an outstanding warrant. Detective Rogers' report makes it clear that the officers specifically told Ms. Cruz that they were at her house looking for Mr. Medina, and the application for a criminal complaint in this case explicitly states that Ms. Cruz gave consent, "to look *for the defendant* in the residence." A reasonable person in Ms. Cruz's position would have understood that she was allowing the police to look in those places where a grown man could hide.

The police, however, vastly exceeded the boundaries established by the claimed consent. Not only did they ferret into areas that could not possibly have concealed Mr. Medina – e.g., the area under a seat cushion, a six inch space under the stairs, and in ceiling insulation – they did so *after they had apprehended him*. Thus, the police ignored both the physical and temporal constraints imposed on them by the scope of Ms. Cruz's alleged consent. Accordingly, any evidence discovered by the police during the search must be suppressed.

11

B.    Ms. Cruz's after the fact consent insufficient to justify original illegal search.

Equally misplaced is any reliance by the Government on Ms. Cruz's alleged second, after the fact written consent to search.  It is axiomatic that a consent form executed after a search has ended cannot breath legal life into an otherwise unlawful and unjustified search.  United States v. Matthews, 05-10073-NG (D. Mass. 2006) (Gertner, J.).  Prior to signing the consent form, Ms. Cruz had been informed of the ammunition recovered during the prior search, seen her boyfriend carted off in handcuffs, and threatened with eviction if she did not agree to sign the consent form. "[W]here, as here, an illegal search precedes the consent, the government must establish that the consent was sufficiently attenuated from the illegal search to purge the taint of the prior illegality." United States v. Matthews, 05-10073-NG (D. Mass. 2006) (Gertner, J.) (citing, United States v. Goodrich, 183 F.Supp. 135, 145 (D. Mass. 2001); United States v. Pena, 924 F.Supp. 1239, 1250 (1996)).

To show that the taint has been dissipated, the government must demonstrate that, "'there was some significant intervening time, space, or event'" between the illegal search and the consent relied on.  United States v. Chambers, 395 F.3d 563, 569-70 (6th Cir. 2005) (quoting, United States v. Vasquez, 638 F.2d 507, 528 (2d Cir. 1980)).  In factually similar cases, the courts have refused to rule that the taint was purged.  See Chambers, 395 F.3d at 569-70 (where defendant was informed of illegal search and discovery of incriminating evidence a "highly coercive atmosphere" was created and defendant could reasonably believe that refusal to consent would be a "futile gesture"); Holloway v. Wolff, 482 F.2d 110, 115 (8th Cir. 1973) (consent ineffective where defendant informed that her home had been breached and searched, that

12

incriminating evidence had been found, and she could see that, "the police had firm control over her home.").

Ms. Cruz's alleged written consent was given immediately after the illegal entry into and search of her home by the Haverhill Police. She personally had been subjected to the coercive tactics of the officers, and had witnessed them assume total control over her home. The officers made a point of showing her the incriminating evidence they had discovered, and then threatened her family's well-being by suggesting that a failure to consent could jeopardize her housing. Under these circumstances, the taint of the primary illegality was not purged and Ms. Cruz reasonably believed that a refusal to consent would be a "futile gesture."[3]

Because neither of Ms. Cruz's alleged consents were voluntary, and because her alleged written consent was tainted by the illegal search that preceded it, the government has failed to meet its burden of showing a consent exception to the warrant requirement in this case.

4.     THE EVIDENCE AGAINST MR. MEDINA MUST BE SUPPRESSED BECAUSE THE SEARCH EXCEEDED THE SCOPE OF A LEGITIMATE PROTECTIVE SWEEP.

Building on their argument that they had consent to enter Ms. Cruz's home, the police suggest that the evidence against Mr. Medina was discovered in the course of a "protective sweep." "A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990)(emphasis added). A protective sweep is justified only if the police have, "a

---

[3] For the reasons detailed above any reliance by the Government on Ms. Cruz's alleged consent to establish inevitable discovery is equally futile. United States v. Matthews, 05-10073-NG (D.Mass. 2006(Gertner, J.).

13

reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing' that the area swept harbored <u>an individual</u> posing a danger to the officer or others." <u>Buie</u>, 494 U.S. at 327 (<u>citing</u>, <u>Michigan v. Long</u>, 463 U.S. 1032, 1049-50 (1983))(emphasis added).

This argument fails for two reasons.

First, even on the police's account, the sweep was conducted *after* they had apprehended Mr. Medina, and they make no claim that they had a reasonable suspicion, based on articulable facts, that anyone else who might have posed a danger was present. Indeed, by the time they arrested Mr. Medina, the police had already completed an exhaustive sweep of the areas of Ms. Cruz's home where a threatening third party might be found. Accordingly, they were constitutionally required to refrain from 'sweeping' further. "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." <u>Buie</u>, 494 U.S. at 335; <u>See also</u>, <u>United States v. Martins</u>, 413 F.3d 139, 149 (1st Cir. 2005); <u>United States v. Paradis</u>, 351 F.3d 21, 29 (1st Cir. 2003) (protective sweep yielding gun  illegitimate where individual sought already in custody, police had already been through entire apartment, and no reason to believe that other persons present).

Second, the search here far exceeded a "cursory visual inspection" of areas in which a threatening person might be hiding. In this case, the police undertook a thorough and intensive search of areas where a person could not possibly be concealed, including under a seat cushion. <u>Cf.</u>, <u>Paradis</u>, 351 F.3d at 26-30 (suppressing gun found on bed after arrest of defendant). It was only as a result of this encroachment on places not contemplated by the protective sweep

14

doctrine, at a point in time when the justification for that doctrine was exhausted, that the officers discovered the ammunition in this case. Therefore, the evidence obtained must be suppressed.

5. THE POLICE MAY NOT RELY ON EXIGENCIES OF THEIR OWN MAKING TO JUSTIFY THE SEARCH IN THIS CASE.

The ammunition recovered in this case must be suppressed on the further ground that the search of the basement was the byproduct of circumstances deliberately created by the police. United States v. Curzi, 867 F.2d 36 (1st Cir. 1989). In Curzi, the First Circuit held that the volitional acts of law enforcement could not be relied on by the Government to justify a warrantless search. In Curzi, the police staked out a home within which were several individuals wanted on various federal charges. Curzi, 867 F. 2d at 37. The surveillance continued undetected for a period of hours. Id. At 38. At the election and the time set by law enforcement the occupants of the house were ordered to exit the residence and the police subsequently conducted a protective sweep of the residence. Id. The Court held that "calculated predesign" by law enforcement to deliberately create circumstances justifying a warrantless search cannot be sanctioned. Id. at 42-43. See also United States v. Munoz-Guerra, 788 F.2d 295 (5th Cir. 1986)(government could not justify search based upon circumstances of its own making); United States v. Morgan, 743 F.2d 1158, 1163-64 (6th Cir. 1984)(police not free to create circumstances to justify intrusions); United States v. Torres, 274 F. Supp. 2d 146 (D. Rhode Island 2003)(police cannot manufacture circumstances to excuse otherwise unconstitutional search).

Here, the police concede that all of the ammunition they discovered in this case was found *after* they had safely taken Mr. Medina into custody. Moreover, the police deliberately and

15

intentionally decided not to take Mr. Medina directly from the utility room to the outside of the residence.  Rather, the police chose to reenter the basement with Mr. Medina in tow.  There was absolutely no need to do so and there decision to do so cannot justify a further intrusion and search of the premises based on their alleged safety concerns.[4]  The police claim that they found ammunition under the cushion of a  chair only because they needed to perform a "security check" in that area before allowing Mr. Medina to sit down.  This justification ignores the obvious response.  Namely, that the utility room in which Mr. Medina was arrested exits directly into the backyard of Ms. Cruz's house.  If the police were seriously concerned that Mr. Medina, handcuffed and surrounded, represented a continuing threat to their well-being, the reasonable course of action would have been to remove him to a controlled environment – i.e., a patrol car – as quickly as possible.  Rather than taking that eminently sensible course, however, the police chose to bring him back into an area where, they claim, he posed a threat to them.

The police, in short, made an affirmative decision to place themselves in a position which they now seek to characterize as quasi-exigent and to use to justify their actions.  This they cannot do.  Curzi, 867 F. 2d 36;  United States v. Levasseur, 699 F.Supp. 995, 1000 (1988).  Accordingly, the search of the basement violated the Fourth Amendment, requiring suppression of the evidence seized there from as fruits of an illegal search and the subsequent statements also as a fruit of the illegal seizure.  United States v. Calandra, 414 U.S. 338, 347 (1974); Wong Sun v. United States, 371 U.S. 471 (1963).

---

[4] To find otherwise, would lead to the inexorable position that the police would be within their rights to walk a handcuffed, arrested person into each room of a house in order to allow them to conduct a search without a warrant.  Such a conclusion would eviscerate the Fourth Amendment.

6.    MR. MEDINA'S STATEMENTS MUST BE SUPPRESSED BECAUSE THEY WERE INVOLUNTARY.

It is axiomatic that a statement obtained via police coercion violates due process.  See, Haynes v. Washington, 373 U.S. 1336, 1343 (1963); Fikes v. Alabama, 352 U.S. 191, 197 (1957).  It is equally well established that physical abuse is not the only method by which a statement may be rendered involuntary.  See, Reck v. Pate, 367 U.S. 433, 440 ("'The blood of the accused is not the only hallmark of an unconstitutional inquisition.'" (quoting, Blackburn v. Alabama, 361 U.S. 199, 206)).  Rather, "[t]he question in each case is whether a defendant's will was overborne at the time he confessed."  Reck, 367 U.S. at 440 (citations omitted).  Whether an accused's will was overborne is determined by examining the totality of the circumstances surrounding the making of the statement.  Id.; See also, Greenwald v. Wisconsin, 390 U.S. 519, 521 (1968).  The totality of the circumstances include, but are not limited to: 1) the lack of counsel; 2) the lack or inadequacy of warnings as to constitutional rights; 3) the use of threats by the police; and, of course 4) the custody status of the accused.  See generally, Miranda v. Arizona, 384 U.S. 436 (1966); Haynes, 373 U.S. 503 (1963); Lynumn v. Illinois, 372 U.S. 528 (1963).

Examining the totality of the circumstances in this case, we find that, at the time he made statements, Mr. Medina was under arrest and handcuffed.  He was alone in a basement with several police officers who, only moments before, had approached with guns drawn and trained on him.  He knew that those officers had forcefully swept into the house, and he was watching them systematically dismantle the room around him.  And, while Mr. Medina denies the police's allegation that he was Mirandized, not even the police make a claim that Mr. Medina validly

17

waived <u>Miranda</u> before they began demanding that he lead them to the gun they were so certain he possessed.

Under these circumstances, it is impossible to maintain that Mr. Medina's statements were, "'the product of a rational intellect and a free will.'" <u>Reck</u>, 367 U.S. at 440 (<u>quoting</u>, <u>Blackburn</u>, 361 U.S. at 208). Instead, they were the product of the inherently coercive atmosphere of custodial interrogation, isolation, and fear of armed officers and their demands. Their admission in evidence would therefore violate due process and they must be excluded.

7.    MR. MEDINA'S STATEMENTS MUST BE SUPPRESSED BECAUSE THEY WERE OBTAINED IN VIOLATION OF MIRANDA.

Recognizing that the compulsion inherent in custodial interrogation threatens the Fifth Amendment's guarantee against compelled self-incrimination, the Supreme Court observed in <u>Miranda v. Arizona</u> that, "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." <u>Miranda v. Arizona</u>, 384 U.S. 436, 458 (1966). The Court therefore held that whenever, "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" and the authorities interrogate him, any statements elicited will be inadmissible unless they were preceded by the now familiar "Miranda warnings" and a valid waiver of the rights to silence and counsel explained in those warnings. <u>Miranda</u>, 384 U.S. at 444. "Interrogation," for purposes of <u>Miranda</u>, includes "either express questioning or its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-301 (1980).

In this case, there is no question that Mr. Medina was in custody for purposes of <u>Miranda</u> – he had been arrested pursuant to a warrant, and handcuffed, before the police questioned him.

18

There is also no doubt that Mr. Medina was "interrogated."  The police's repeated demands that he tell them the location of a firearm were calculated to produce an incriminating response and constitute the essence of interrogation, not merely its "functional equivalent."  Under these circumstances, it was incumbent upon the officers to <u>Mirandize</u> Mr. Medina before questioning him.  Mr. Medina emphatically denies that he was advised of his <u>Miranda</u> rights at any time while in the basement of Ms. Cruz's home.  But even if he was "informed" of those rights by Lieutenant Dorr, as the police claim, there is absolutely no evidence that he waived those rights. The police reports make no reference to a waiver, nor has a signed waiver form been disclosed. And, as <u>Miranda</u> itself teaches, a waiver may not be presumed from a silent record, or *even from the defendant's response* to interrogation by the police.  <u>See</u>, <u>United States v. Porter</u>, 764 F.2d 1, 7 (1st Cir. 1985) ("*Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them.").   Therefore, the government cannot meet its heavy burden of demonstrating that Mr. Medina made a knowing and intelligent relinquishment of his right against self-incrimination, and his statements must be suppressed.

REQUEST FOR EVIDENTIARY HEARING

Mr. Medina requests an evidentiary hearing on this Motion and reserves the right to modify it and/or file supplemental pleadings in response to submissions by the government.

GEORGE L. MEDINA
By his attorney,


/s/ Stylianus Sinnis
Stylianus Sinnis
B.B.O. #560148
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Stylianus Sinnis, do hereby certify that this document hasbeen filed electronically and that it will be served electronically to registered ECF participants as identified on the Notice of Electronic Filing (NEF) and by sending paper copies to non-registered participants all on April 17, 2006.


/s/ Stylianus Sinnis
Stylianus Sinnis



**Not For Public Release**    Date/Time Printed: Thu Mar 10 12:54:35 EST 2005 By: rpr37

Case Title                              Location
**MEDINA**                              **15 BROOK ST**
Date/Time Reported                      Date/Time Occurred
**03/10/2005 10:54:00**                 **to**
Incident Type/Offense unlawful  Poss.      269/10
AMMUNITION, UNLICENSED SALE OF c140 S122B (140/122B)
Reporting Officer                       Approving Officer
**ROGERS, R (37)**                      ( )

## Persons

| Role | Name | Sex | Race | Age | DOB | Home Phone | Address |
|------|------|-----|------|-----|-----|------------|---------|

## Offenders

| Status | Name | Sex | Race | Age DOB | Home Phone | Address |
|--------|------|-----|------|---------|------------|---------|
| DEFENDANT | MEDINA, JORGE LUIS | MALE | WHITE | 25 - 09/30/1979 | | 45 JACKSON STREET HAVERHILL, MA |

## Vehicles

## Property

| Class | Description | Make | Model | Serial # | Value |
|-------|-------------|------|-------|----------|-------|

## Narrative

Detectives Rogers, Melanson and Sgt. Arahovites went to 15 Brook Street Haverhill, Ma. in order to arrest the Defendant on an outstanding warrant. The Defendant's girlfriend, Jacqueline Cruz answered the door and let the detectives into the house. The detectives explained to her why they were there. Jacqueline Cruz stated that the defendant was not there but gave the detectives permission to search the entire residence. Defendant was found hiding on a basement floor partially covered up by rags. Detectives confirmed the warrant for the defendant through Dispatch. The defendant was placed under arrest. The defendant wanted to sit down in order to put his shoes on. Defendant was wanted for questioning in a shooting that occurred the night before and due to that reason a security check was made for any other parties that may attempt to aid in defendants escape. A check was made under a seat cushion before the defendant was to sit down for the detectives safety.. A hand gun, believed to be a pellot gun, was located underneath a seat cushion along with 6 rounds of .22 caliber ammunition. A box of additional ammunition was found on the floor near the seat. When defendants girlfriend string, defendant admitted that the bullets were his after being informed of his rights

Dorr, Officer in charge. Defendant stated he always carries six bullets in a bag, but does not know why. Defendant stated that the box of bullets were his too, but he had not touched them for a long time. Defendant stated that he stays with his girlfriend, Jackie Cruz, but does not live there because of the rules of the lease. Defendant was transported to the Police Station where he was read his Miranda rights by Lt. Dorr and advised of the charges placed against him. The evidence was placed in a locked container awaiting analysis..

| APPLICATION FOR CRIMINAL COMPLAINT | APPLICATION NO. (COURT USE ONLY) | PAGE 1 of 2 | Trial Court of Massachusetts District Court Department |
|---|---|---|---|

I, the undersigned complainant, request that a criminal complaint issue against the accused charging the offense(s) listed below. If the accused **HAS NOT BEEN ARRESTED** and the charges involve:

☐ ONLY MISDEMEANOR(S), I request a hearing ☐ **WITHOUT NOTICE** because of an imminent threat of
   ☐ BODILY INJURY ☐ COMMISSION OF A CRIME ☐ FLIGHT ☐ **WITH NOTICE** to accused.
☐ ONE OR MORE FELONIES, I request a hearing ☐ **WITHOUT NOTICE** ☐ **WITH NOTICE** to accused.

☐ **WARRANT** is requested because prosecutor represents that accused may not appear unless arrested.

HAVERHILL DISTRICT COURT
45 GINTY BLVD
HAVERHILL, MA 01830

ARREST STATUS OF ACCUSED
☐ HAS    ☐ HAS NOT been arrested

## INFORMATION ABOUT ACCUSED

| NAME (FIRST MI LAST) AND ADDRESS | BIRTH DATE 09/30/1979 | SOCIAL SECURITY NUMBER 017601306 |
|---|---|---|
| JORGE LUIS MEDINA | PCF NO. | MARITAL STATUS UNMARRIED |
| 45 JACKSON STREET | DRIVERS LICENSE NO. | | STATE |
| HAVERHILL MA | | | |

| GENDER MALE | HEIGHT 505 | WEIGHT 175 | EYES BROWN |
|---|---|---|---|

| HAIR BLK | RACE WHITE | COMPLEXION MEDIUM BRO | SCARS/MARKS/TATTOOS MARIA LEFT CHEST, THUG LIFE ON STOMACH | BIRTH STATE OR COUNTRY BOSTON MA | DAY PHONE |
|---|---|---|---|---|---|

| EMPLOYER/SCHOOL GREENER PASTURES | MOTHER'S MAIDEN NAME (FIRST MI LAST) MARTHA | FATHER'S NAME (FIRST MI LAST) DECEASED |
|---|---|---|

## CASE INFORMATION

| COMPLAINANT NAME (FIRST MI LAST) PATROLMAN ROBERT P ROGERS | COMPLAINANT TYPE ☐ POLICE ☐ CITIZEN ☐ OTHER | PD HAV |
|---|---|---|

| ADDRESS | PLACE OF OFFENSE HAVERHILL |
|---|---|
| HAVERHILL PD | INCIDENT REPORT NO. 5005472    OBTN THAE500000504 |
| 40 BAILEY BLVD | |
| HAVERHILL, MA 01830 | CITATION NO(S). |

| OFFENSE CODE 140/122B | DESCRIPTION AMMUNITION, UNLICENSED SALE OF C140 S122B | OFFENSE DATE 03/10/2005 10:58:00 |
|---|---|---|
| VARIABLES (e.g. victim name, controlled substance, type and value of property, other variable information; see Complaint Language Manual) [CONTROLLED SUBSTANCE: .22 cal ammunition] | | |

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| VARIABLES | | |

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| VARIABLES | | |

| REMARKS | COMPLAINANT'S SIGNATURE X | DATE FILED |
|---|---|---|

| COURT USE ONLY | A HEARING UPON THIS COMPLAINT APPLICATION WILL BE HELD AT THE ABOVE COURT ADDRESS ON | DATE OF HEARING | TIME OF HEARING AT | COURT USE ONLY |
|---|---|---|---|---|

## PROCESSING OF NON-ARREST APPLICATION (COURT USE ONLY)

| DATE | | CLERK/JUDGE |
|---|---|---|
| | NOTICE SENT OF CLERK'S HEARING SCHEDULED ON: | |
| | NOTICE SENT OF JUDGE'S HEARING SCHEDULED ON: | |
| | HEARING CONTINUED TO: | |
| | APPLICATION DECIDED WITHOUT NOTICE TO ACCUSED BECAUSE: ☐ IMMINENT THREAT OF ☐ BODILY INJURY ☐ CRIME ☐ FLIGHT BY ACCUSED ☐ FELONY CHARGED AND POLICE DO NOT REQUEST NOTICE ☐ FELONY CHARGED BY CIVILIAN; NO NOTICE AT CLERK'S DISCRETION | |

| DATE | COMPLAINT TO ISSUE | COMPLAINT DENIED | CLERK/JUDGE |
|---|---|---|---|
| | ☐ PROBABLE CAUSE FOUND FOR ABOVE OFFENSE(S) NO(S). ☐ 1. ☐ 2. ☐ 3. BASED ON ☐ FACTS SET FORTH IN ATTACHED STATEMENT(S) ☐ TESTIMONY RECORDED: TAPE NO._____ START NO._____ END NO._____ ☐ WARRANT ☐ SUMMONS TO ISSUE ARRAIGNMENT DATE: | ☐ NO PROBABLE CAUSE FOUND ☐ REQUEST OF COMPLAINANT ☐ FAILURE TO PROSECUTE ☐ AGREEMENT OF BOTH PARTIES ☐ OTHER: COMMENT | |

DCCR-2 (08/04)

| STATEMENT OF FACTS | APPLICATION NO (court use only) | PAGE | Trial Court of Massachusetts |
|---|---|---|---|
| IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT | | 2 OF 2 | District Court Department HAVERHILL DISTRICT COURT 45 GINTY BLVD HAVERHILL, MA 01830 |

| The undersigned alleges the following as a ☐ full or ☐ partial statement of the factual basis for the offense(s) for which a criminal complaint is sought | COURT DIVISION |
|---|---|

defendant was arrested on an outstanding warrant. Defendants girlfriend let officers in the house and gave permission to look for the defendant in the residence. Defendant was found hiding on a basement floor partially covered up by rags. Defendant was wanted for questioning in a shooting that occurred the night before and due to that reason a security check was made for any other parties that may attempt to aid in defendants escape. a hand gun, believed to be a pellot gun, was located underneath a seat cushion along with 6 rounds of .22 caliber ammunition. A box of additional ammunition was found on the floor near the seat. A check was made under the cushion prior to the defendant sitting down on the seat. When defendants girlfriend brought defendant his shoes (Sneakers), there was another .22 cal bullet tied onto the shoe string. defendant admitted that the bullets were his after being informed of his rights the Lt Kevin Dorr, Officer in charge. He stated he always carrys six bullets in a bag, does not know why. he stated that the box of bullets were his too, but he had not touched them for a long time. he stated that he stays with his girlfriend. jackie Cruz, but does not live there because of the rules of the lease.

(Use additional sheets if necessary)

| PRINTED NAME | SIGNATURE X | I AM A: ☐ LAW ENFORCEMENT OFFICER ☐ CIVILIAN COMPLAINANT OR WITNESS | DATE SIGNED |
|---|---|---|---|

ADDITIONAL FACTS BY CLERK-MAGISTRATE/ASST. CLERK/JUDGE BASED ON ORAL TESTIMONY

| REMARKS | SIGNATURE OF CLERK-MAGISTRATE/ASST CLERK/JUDGE X | DATE SIGNED |
|---|---|---|

CJIS 659381  03/10/05 0827 000.
MEDINA,GEORGE                                    W6427775
Commonwealth of Massachusetts - Criminal Justice Information System
Trial Court of Massachusetts - Warrant Management System
Pursuant to Massachusetts General Laws ch.276 s.23A this is a TRUE WARRANT on
the person named herein as contained in the Warrant Management System and
printed via Criminal Justice Information System.
This Warrant Printed as of 08:27 on 03/10/05

Defendant Information:
    Name: MEDINA,GEORGE                           SS#: 017601306
    Address: 45 JACKSON ST                        Race: U      Sex: M
                                                  Hair: BRO    Eyes: BRO
    City: HAVERHILL              MA 01830          Weight: 160 Height: 5'05"
                                                  Complexion:    Marks:
    Date of Birth: 09/30/1979 Place of Birth: MA Date of Emancipation: 00/00/0000
    Father:                         Mother:
    Known Alias:                                   Ref No: W6427775

    License No:                                    Misc No:
License State: MA           Obtn No:               CC No:

Warrant Information:                               Docket: 0338CR002804
    Issue Date: 11/03/2004  Court of Issue: 38   - HAVERHILL DISTRICT
       Type: D - DEFAULT                                98377
  Date of Complaint: 12/16/2003
       Offense Date: 11/12/2003  Offense Location: HAVERHILL

  *************************** Charges ***************************
  Count    Offense Code                    Description
    1  M-  90/23/D           LICENSE SUSPENDED, OP MV WITH c90 S23
    1  M-  90/23/D           LICENSE SUSPENDED, OP MV WITH c90 S23
    1  CM  90/7/D            EQUIPMENT VIOLATION, MISCELLANEOUS MV c90 S7

Court Information: FAILED TO PAY FINE/COSTS
Assigned for Service To: HAE - HAVERHILL PD
Warrant printed by:     HAE - HAVERHILL PD - MAIN TERMINAL
                                          Fine Amount:        $50.00
Officer Name:                             Bail Amount:        $50.00
Judge's Name: HEALIHY,KEVIN               Cash only
Return Date/Time: 02/06/2004 08:30   Recall Date/Time: 00/00/0000 00:00

               * * * Return of Service on Page 2 * * *

Therefore you are hereby commanded to arrest the above named
defendant and bring the defendant forthwith before this court
to answer to the offense(s) listed above and to be dealt with
according to law.

Return of Service: By virtue of this warrant, I certify that:

_____ The defendant has been arrested as ordered by the court:
_____ I am returning the warrant without service to the court.

| Date of Arrest | Signature of Person Making Service | Title of Person Making Service | Department of Person Making Service |
|---|---|---|---|
| | | | |



UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-10213-NMG |
| | ) | |
| GEORGE L. MEDINA | ) | |

AFFIDAVIT OF DEFENDANT IN
SUPPORT OF MOTION TO SUPPRESS

I, George L. Medina, do hereby depose and say as follows:

1.    I am the defendant in the above-referenced case.

2.    On March 10, 2005, I was inside 15 Brook Street, Haverhill, MA.  I had spent the night at 15 Brook Street.  My girlfriend, Jacqueline Cruz, rented and resided at 15 Brook Street.

3.    Early on the morning of March 10, 2005 there was a knock on the door of 15 Brook Street.  I went down to the basement and then into a separate utility room off the basement.  I closed the door that led from the basement to the utility room.  I put rags and clothing over my body in an effort to hide.

4.    Shortly thereafter several police officers entered the utility room and discovered me.  Each and every officer had their gun drawn and pointed at me.  I recall there being three to four officers in the basement and utility room.

5.   The police immediately placed me in handcuffs.  At the
     time the police placed me in handcuffs I was still in
     the utility room off the basement.  There is a an exit
     off the utility room directly to the outside of the
     apartment.

6.   After being handcuffed, the police brought me into the
     basement.

7.   While in the basement, the police sat me on the stairs
     leading up to the first floor of the apartment.   At
     that time the police began to search the basement.  I
     asked the police if I could put my boots on and they
     said no.  The officers repeatedly said to me where is
     the gun, we know you have a gun.  During the search of
     the basement, the police pulled down insulation from
     the ceiling and searched under seat cushions and
     throughout the entire basement.  The search of the
     basement lasted approximately 10 minutes.

8.   I did not consent to any search and the police did not
     have a search warrant.

9.   While I was still handcuffed and in the basement the
     police questioned me regarding bullets they found
     during their search of the basement.  They had not yet
     read me my rights, and I had not signed a <u>Miranda</u>
     waiver.

-2-

10.  I answered questions put to me by the police.  I had
     not been read my <u>Miranda</u> warnings at that time.


The above is true to the best of my knowledge.

Signed under the penalties of perjury,


George L. Medina

Date

-3-



UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA  )
                        )
      v.               )      CRIMINAL NO. 05-10213-NMG
                        )
GEORGE L. MEDINA         )

## AFFIDAVIT OF JACQUELINE CRUZ

I, Jacqueline Cruz, do hereby depose and say as follows:

1.    I was born on December 21, 1973 and I have three children. I am the girlfriend of George L. Medina.

2.    On March 10, 2005, I resided at 15 Brook Street, Haverhill, MA. On the morning of March 10, 2005, Mr. Medina was a welcome resident at my apartment.

3.    Early on the morning of March 10, 2005 there was a knock on the door. I asked who it was and the people on the other side of the door responded that it was "maintenance."

4.    I opened the door and was immediately confronted by police officers. One officer placed his foot in the door and another officer walked right into the apartment and entered the living room.

5.    One officer asked me where "George" was and I said I did not know. The first officer was already inside and looking around the apartment. The officer then asked me if they could look for George. I said yes. I said yes because the officers were already inside my home

looking for George and I did not feel as if I had a
choice.  At that time, I did not give the officers
permission or consent to search the apartment.

6.    The police looked throughout first floor and basement
of the house and found George in a utility room that is
off the basement.

7.    I heard a police officer say over his walkie-talkie
that they needed a search warrant.  The police were in
the basement for approximately 10 minutes.

8.    At some point the police brought George up from the
basement.  He was in handcuffs when he came up from the
basement.  The police told me that they had found
bullets in the basement.  They asked me to get him a
pair of shoes, which I did.  They then took George out
of the apartment.

9.    Sometime after George had been taken out of the
apartment and the bullets had been recovered a
detective and a uniformed police officer presented me
with a written consent to search form.  I signed the
form because they had already searched my house and I
did not think I had a choice. The police also
threatened to tell the housing authority that George
was staying there if I didn't give consent.

10. Prior to signing the consent form I had never given any police officers permission to search my house for anything other than George.

The above is true to the best of my knowledge.

Signed under the penalties of perjury,

_Jacqueline Cruz_
Jacqueline Cruz

_4-11-06_
Date

-3-