```
               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
V.                       )     CRIMINAL NO. 05-CR-10213-NMG
                         )
GEORGE L. MEDINA         )
a/k/a JORGE L. MEDINA    )
```

**GOVERNMENT'S REVISED OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The government submits this revised opposition motion and memorandum of reasons in response to the defendant's motion to suppress. [D. 17]. The defendant seeks to suppress a plastic bag containing six bullets, a box containing 82 bullets, a bullet tied to the defendant's shoelace, and statements regarding the defendant's ownership of all of the aforementioned bullets. The government submits this revised opposition as a supplement to its first opposition [D. 19], after learning of new and potentially exculpatory evidence regarding a signed Consent Search Waiver form during witness preparation interviews on the morning of May 18, 2006, prior to a suppression hearing scheduled for that day.

Notwithstanding the new evidence, the defendant's motion should still be denied. The police had valid verbal and implied consent to enter 15 Brook Street in Haverhill, the residence where the defendant and all of the bullets were located. The police found the bag of bullets pursuant to a search incident to a valid arrest. Moreover, they found the box of bullets and the bullet tied to the defendant's shoelace pursuant to the plain

view doctrine. Finally, the defendant was properly advised of his <u>Miranda</u> rights and chose to speak to police officers about the bullets.

## I.   STATEMENT OF FACTS[1]

A. <u>THE APRIL CONVERSATIONS BETWEEN THE OFFICERS AND THE GOVERNMENT</u>

On April 24, 2006, Lt. Kevin Dorr, Det. Gary Melanson and Det. Rob Rogers of the Haverhill Police Department met with Special Agent Sheila O'Hara of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and undersigned counsel for the purpose of preparing a response to the defendant's suppression motion. On April 27, 2006, Sgt. John Arahovites spoke with S/A O'Hara and undersigned counsel via a telephone conference call for the same purpose. On April 28, 2006, Sgt. Dana Burrill spoke by phone with S/A O'Hara and undersigned counsel for the same purpose. The government relied on these conversations to prepare its first opposition to the defendant's motion to suppress. [D.19]. The substance of the officers' statements in these conversations is set forth in that opposition motion, which, for the sake of brevity, the government does not repeat here. [D. 19 at 2-6].

B.   <u>THE MAY 18 CONVERSATIONS BETWEEN THE OFFICERS AND THE</u>

---

[1] These facts come from police reports, ATF reports, and witness interviews conducted on the following dates: April 24, 27, and 28, 2006; May 18, 2006; and June 5, 2006. The government expects to elicit these facts at any suppression hearing.

2

GOVERNMENT

On the morning of May 18, 2006, the same officers appeared at the United States Attorney's Office (USAO) in anticipation of a suppression hearing scheduled for that afternoon. They were accompanied by Officer Fred Corthell, who was subpoenaed by the defendant. All of the officers waited in a conference room at the USAO while S/A O'Hara and undersigned counsel conducted individual witness preparation interviews in a separate room.

1. Sgt. Arahovites

The first officer to speak with S/A O'Hara and undersigned counsel that morning was Sgt. Arahovites. During that initial meeting, Sgt. Arahovites stated facts that were consistent with the facts he had previously stated on April 27, 2006. In particular, Sgt. Arahovites stated that on the morning of March 10, 2005, he went to 15 Brook Street in Haverhill with Det. Melanson and Det. Rogers to look for the defendant at the instruction of Sgt. Burrill, who was investigating a shooting that had taken place the previous night in which the defendant was wanted for questioning. Also consistent with his previous statements, Sgt. Arahovites stated that he knocked on the door of 15 Brook Street, identified himself as Haverhill Police, and that a Hispanic woman later identified as Jacqueline Cruz, the defendant's girlfriend, opened the door. Also consistent with his previous statements, he stated that he asked Ms. Cruz if the

defendant was inside, and that she responded that he was not.

Then, for the first time, Sgt. Arahovites stated that he asked Ms. Cruz if the officers could come inside and look for the defendant. But, consistent with his previous statements, he stated that Ms. Cruz was calm and cooperative with him, that he did not threaten her, did not draw his gun, did not push his way into the house, and did not enter the house until she invited him to do so. Finally, Sgt. Arahovites stated that he believed that Ms. Cruz signed a Consent Search Waiver form shortly after he and the other two officers entered the house, and shortly before they discovered the defendant in the basement. Sgt. Arahovites looked at the form and said that he signed and dated it.

2. Det. Rogers

The next officer to speak with S/A O'Hara and undersigned counsel on the morning of May 18, 2006, was Det. Rogers. Consistent with his previous statements, Det. Rogers stated that he went to 15 Brook Street with Sgt. Arahovites and Det. Melanson, and was standing on the porch while Sgt. Arahovites knocked on the front door and spoke with Ms. Cruz. Also consistent with his previous statements, he said that Ms. Cruz seemed calm and helpful, that he did not threaten her, did not draw his gun, did not push his way into the house, and did not enter the house until he heard her invite the officers in.

However, when asked what he did next, Det. Rogers

equivocated. He stated he was no longer certain whether he went to his car to get a Consent Search Waiver form, although he said he remembered telling S/A O'Hara and undersigned counsel on April 24, 2006, that he did so. He stated the reason for his uncertainty was that he did not sign the form himself. He stated that during the April 24, 2006, meeting, he assumed that he went back to his car to get the form, because he usually carries such forms in his car when he, Sgt. Arahovites, and Det. Melanson work together.

    3.   <u>Re-interviewing Sgt. Arahovites</u>

At the end of Det. Rogers' interview, Sgt. Arahovites came back into the room and requested to speak again with S/A O'Hara and undersigned counsel. Sgt. Arahovites brought in with him a copy of the defendant's booking report, which he stated he had not reviewed until that morning. He stated that the booking report reflected that the defendant was booked at 10:50 AM, and that the Consent Search Waiver form was signed at 10:45 AM. He stated that looking at those times refreshed his recollection that the Consent Search Waiver form was signed after the officers found the defendant hiding in the basement, not before, as he had previously stated. He added that he now also recalled Sgt. Burrill arriving on the scene after the defendant was found, and that Sgt. Burrill may have given him the Consent Search Waiver form.

### 4. Re-interviewing Det. Rogers

At this point, undersigned counsel called counsel for the defendant and advised that Sgt. Arahovites and Det. Rogers had made potentially exculpatory statements. Det. Rogers was then re-interviewed regarding the Consent Search Waiver form. Det. Rogers said he was now certain that he did not provide Sgt. Arahovites with the Consent Search Waiver form at the time the officers initially entered the house, because if he had done so, he would have signed it himself. He also said he had looked again at the defendant's booking report, which helped him remember that he drove back to the police station with the defendant for booking. He said he may have provided a Consent Search Waiver form to Sgt. Arahovites or Sgt. Burrill just prior to returning to the police station, but could not be certain.

### 5. Sgt. Burrill

The next officer interviewed on the morning of May 18, 2006, was Sgt. Burrill. He stated that on March 10, 2005, he was investigating a shooting from the previous night, and had received information that the defendant, a possible suspect in the shooting, was at his girlfriend's house at 15 Brook Street. Consistent with his previous statements, Sgt. Burrill stated that he asked Sgt. Arahovites, Det. Rogers, and Det. Melanson to go to 15 Brook Street to arrest the defendant on an outstanding warrant. Sgt. Burrill stated he proceeded to 15 Brook Street

after hearing that the defendant had been apprehended there. Sgt. Burrill stated that when he got there, the defendant was standing near the front entrance in handcuffs. Sgt. Burrill stated that the defendant's girlfriend brought the defendant a pair of sneakers to wear that had a bullet tied to one of the shoelaces. Sgt. Burrill took these sneakers into evidence, and had the defendant's girlfriend bring him another pair of shoes. Then, for the first time, Sgt. Burrill stated that he retrieved a Consent Search Waiver form and gave it to Sgt. Arahovites, so that they could search the house for a .22 caliber pistol matching the .22 caliber bullet that was used in the shooting the previous night.

At this point, undersigned counsel spoke again with counsel for the defendant. Undersigned counsel provided counsel for the defendant with copies of attorney notes taken during the April 24, 2006 meeting. Undersigned counsel then appeared with counsel for the defendant before this Court and requested a continuance to evaluate the new information that had been learned that morning. This Court granted a continuance until June 29, 2006.

C.   THE JUNE 5 CONVERSATION BETWEEN THE OFFICERS AND THE GOVERNMENT

On June 5, 2006, S/A Sheila O'Hara and undersigned counsel met again with the same officers, this time at the Haverhill Police Department. All of the officers were interviewed separately in a witness interview room. The purpose of this

meeting was to examine the new evidence regarding the timing of the Consent Search Waiver form that came to light on the morning of the now-postponed suppression hearing.

    1.   <u>Det. Rogers</u>

The first officer S/A O'Hara and undersigned counsel met with on June 5, 2006, was Det. Rogers.  Det. Rogers explained that the reason he had made an error regarding the timing of the Consent Search Waiver form was that he had done no preparation prior to the April 24, 2006, meeting with the government.  He said he thought the April 24 meeting was an informal meeting, not a meeting to prepare for a suppression hearing in federal court.  He continued to explain that in his unit, the Narcotics Unit, it was the usual practice and procedure to obtain Consent Search Waiver forms prior to conducting a search of a house.  Accordingly, he said that during the April 24 meeting he assumed that he acted consistently with his usual practice and procedure.

Det. Rogers said that the first time he realized he had made an error with respect to the Consent Search Waiver form was on May 18, 2006, after meeting with S/A O'Hara and undersigned counsel to prepare for the suppression hearing later that day. After that meeting, Det. Rogers went to a conference room where the other officers were waiting, with the exception of Sgt. Arahovites, who at that time was being interviewed by S/A O'Hara and undersigned counsel.  In the conference room Det. Rogers

reviewed his report, a report written by Sgt. Burrill, and the defendant's booking report.[2] In the course of reviewing those reports, Det. Rogers realized that his previous statements on April 24, 2006, regarding the Consent Search Waiver form were inaccurate.

### 2. Sgt. Arahovites

The second officer S/A O'Hara and undersigned counsel met with on June 5, 2006, was Sgt. Arahovites. Sgt. Arahovites stated that the first time he reviewed any documents with respect to this case was on May 18, 2006, at the USAO. He planned to review documents on the way to the courthouse, but did not have any copies in the car with him on the way.

Sgt. Arahovites said that after his initial meeting with S/A O'Hara and undersigned counsel on May 18, 2006, something was bothering him about the Consent Search Waiver form. He returned to the conference room where the rest of the officers were waiting, with the exception of Det. Rogers, who at that time was being interviewed by S/A O'Hara and undersigned counsel. In that conference room, he reviewed for the first time the Consent Search Waiver form, Det. Rogers' report, Sgt. Burrill's report, and the defendant's booking report. After reviewing those documents, he returned to speak to S/A O'Hara and undersigned

---

[2]Det. Rogers does not recall reviewing any information provided by Officer Fred Corthell, who was subpoenaed by the defendant.

9

counsel to advise that his earlier statements regarding the Consent Search Waiver form were inaccurate.

    3.   <u>Det. Melanson</u>

The third officer S/A O'Hara and undersigned counsel met with on June 5, 2006, was Det. Melanson.  Det. Melanson stated that on May 18, 2006, he was in a conference room waiting with the other officers, with the exception of Sgt. Arahovites, who was being interviewed by S/A O'Hara and undersigned counsel. Det. Melanson stated that when Sgt. Arahovites returned to the conference room he was concerned that he had made inaccurate statements regarding the Consent Search Waiver form.  At that time, Det. Melanson, Sgt. Arahovites, and Det. Burrill began reviewing documents to determine when the Consent Search Waiver form was signed.  Det. Melanson also recalls reviewing some of the materials brought by Officer Corthell, who was subpoenaed by the defendant.

    4.   <u>Sgt. Burrill</u>

The last officer S/A O'Hara and undersigned counsel met with on June 5, 2006, was Sgt. Burrill.  Sgt. Burrill recalled a phone conversation with S/A O'Hara and undersigned counsel at some point in April, but could not recall having any discussions about the timing of the Consent Search Waiver form until May 18, 2006.

## II. ARGUMENT

The critical issue before this Court is and always has been

whether the officers had valid consent to enter 15 Brook Street and look for the defendant.  In order to prove that consent is valid, the burden is on the government to show by a preponderance of the evidence that consent was voluntary.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973); <u>see</u> <u>also</u> <u>United States v. Winston</u>, 444 F.3d 115, 121 (1st Cir. 2006).  To determine voluntariness, courts look to the totality of the circumstances.  <u>Schneckloth</u>, 412 U.S. at 248-249;  <u>see</u> <u>also</u> <u>United States v. Coraine</u>, 198 F.3d 306, 309 (1st Cir. 1999).

   Voluntariness is a question of fact to be determined from the totality of the circumstances.  <u>Schneckloth</u>, 412 U.S. at 248-249.  Among the factors that a court can consider are the consenting party's "age, education, experience, intelligence, and knowledge of the right to withhold consent."  <u>United States v. Coraine</u>, 198 F.3d 306, 309 (1st Cir. 1999), citing <u>United States v. Barnett</u>, 989 F.2d 546, 555 (1st Cir. 1993).

   Clearly, in light of the statements made by the officers on May 18, 2006, one factor in the totality of circumstances calculation has changed: the timing of the signed Consent Search Waiver form.  But in examining the totality of the circumstances, no one factor is determinative.  <u>Schneckloth</u>, 412 U.S. at 226-227; <u>see</u> <u>also</u> <u>United States v. Barnett</u>, 989 F.2d 546, 555 (1st Cir.), <u>cert.</u> <u>denied</u>, 510 U.S. 580 (1993)(upholding consensual search in part because "written consent is not essential to the

11

establishment of a valid consensual search"). Moreover, even without the signed Consent Search Waiver form, Ms. Cruz still gave the officers verbal and implied consent to enter 15 Brook Street to look for the defendant. As discussed below, this Court must find that Ms. Cruz's verbal and implied consent was voluntary.

A.   VERBAL AND IMPLIED CONSENT FROM MS. CRUZ WAS VOLUNTARY

Leaving aside the Consent Search Waiver form, the officers' recollections about all of the other circumstances surrounding Ms. Cruz's consent and their entry into 15 Brook Street have remained consistent. All three officers recall arriving at 15 Brook Street in broad daylight, in unmarked cars, and wearing plain clothes. All three recall standing on the porch while Sgt. Arahovites knocked on the front door and announced their presence. All three recall Ms. Cruz opening the door. Sgt. Arahovites and Det. Rogers both recall that the tone of the ensuing conversation was civil, while Det. Melanson, who was standing behind Sgt. Arahovites and Det. Rogers towards the back of the porch, recalls that no voices were raised. All three recall Sgt. Arahovites telling Ms. Cruz they were there looking for the defendant. All three recall Ms. Cruz responding that the defendant was not inside and only came over when he wanted to sleep with her. Sgt. Arahovites and Det. Melanson recall asking Ms. Cruz if they could come in and look around. All three recall

Ms. Cruz saying they could come in and look for the defendant. Finally, and critically, all three recall entering 15 Brook Street only after Ms. Cruz opened the door and invited them in.

All of these recollections are consistent with the ones the officers provided to S/A O'Hara and undersigned counsel in the April conversations. More importantly, all of these recollections are consistent with the ones the officers provided to undersigned counsel and S/A O'Hara on the morning of May 18, 2006, when they first realized that their recollections about the Consent Search Waiver form were inaccurate. Furthermore, after reviewing documents and meeting with S/A O'Hara and undersigned counsel for a third time on June 5, 2006, their recollections of this initial exchange with Ms. Cruz and the entry into 15 Brook Street have not changed.

Under these circumstances, even without the Consent Search Waiver form there is ample evidence that Ms. Cruz voluntarily consented to let the officers into 15 Brook Street to look for the defendant. The officers told her that they were there to speak with the defendant. She told the officers while they were standing on the front porch that they could come inside and look for the defendant, and then opened the door so that they could enter. The conversation on the porch was civil, without any threats or displays of weapons. See e.g. Robbins v. MacKenzie, 364 F.2d 45, 49 (1st Cir.), cert. denied, 87 S.Ct. 215

13

(1966)(where resident of house was "fully and honestly informed of the objectives of the police" and then invited them inside, courts are not required to "engage in a psychological or physiological inquiry into whether the invitation was really meant,") quoted with approval in United States v. Carter, 378 F.3d 584, 588 (6th Cir.)(en banc), cert. denied, 378 F.3d 584 (2005).

Moreover, consent need not be verbal; it can be implied from a person's silent conduct. United States v. Winston, 444 F.3d 115, 122 (1st Cir. 2006). Here, Ms. Cruz opened the door to allow the officers in. She voiced no reservations to their entry, either before they entered, or after. Nor did the officers observe anything in her demeanor or physical actions that would have suggested she did not want them to enter her house. In short, Ms. Cruz gave voluntary consent, both in her words and in her actions.

B. THE FACTS IN THIS CASE ARE SIMILAR TO THE FACTS IN ROMAIN

Even without the Consent Search Waiver form, the facts in this case remain similar to those in United States v. Romain, 393 F.3d 63 (1st Cir. 2003); see also Government's Opposition to Defendant's Motion to Suppress [D.19] at 10. In Romain, officers arrived at an apartment in response to a 911 call from a woman that a man in the apartment had a gun. Id. at 66. As in this case, the officers in Romain knocked on the front door, and

14

explained why they were there to the two women who answered the door.  Id.  As in this case, the officers in Romain asked if they could come in, to which both women said yes.  Id.  The court in Romain found the women there gave voluntary consent to the officers to enter their apartment.  There is no reason for this Court to reach a different conclusion.

C.   COURTS HAVE FOUND VOLUNTARY CONSENT IN CIRCUMSTANCES FAR MORE COERCIVE THAN THOSE AT ISSUE HERE.

Courts have found voluntary consent in circumstances far more coercive than those at issue here.  For example, in United States v. Cepulonis, 530 F.2d 238 (1st Cir. 1976), the defendant was arrested and handcuffed at gunpoint outside his hotel room. Id. at 241.  The defendant asked to speak with his wife and child in the hotel room.  Id.  The agents first conducted a protective sweep of the room, and then asked whether there were any weapons hidden there, to which the defendant replied, "no, go ahead, search."  Id. at 244.  In the ensuing search, the agents recovered contraband.  Id.  The court in Cepulonis upheld the search, finding the defendant's consent was voluntary.  Id.; see also United States v. Winston, 444 F.3d 115, 121-22 (1st Cir. 2006)(overturning district court's suppression of evidence under facts similar to Cepulonis).

The case for voluntary consent is far more compelling here than it was in either Cepulonis or Winston.  First, at no time was Ms. Cruz accused of any wrongdoing herself, while in

15

Cepulonis and Winston consent was given by defendants a few moments after being arrested. Second, unlike Cepulonis and Winston, the officers here did not draw their weapons at any time during the conversation in which Ms. Cruz gave them consent to search. Moreover, unlike Cepulonis and Winston, Ms. Cruz was never handcuffed. Nor is there any evidence that any of Ms. Cruz's children were in 15 Brook Street when the officers arrived. Finally, in this case the officers did not enter 15 Brook Street until Ms. Cruz gave them consent to do so. In contrast, in Cepulonis and Winston, officers were already in the premises to be searched when they sought consent. In short, if consent was voluntary in Cepulonis and Winston, it should be voluntary in this case as well, if not more so.

D.  THE OFFICERS ARE CREDIBLE, EVEN IN LIGHT OF THEIR ERROR REGARDING THE CONSENT SEARCH WAIVER FORM

In determining voluntariness of consent, witness credibility can be an issue. See, e.g., United States v. Jahkur, 409 F.Supp.2d 28, 32 (D.Mass. 2005). In this case, the government readily concedes that there is reason to examine the credibility of the Haverhill Police Department officers, given their initial error regarding the timing of the signed Consent Search Waiver. However, there are several reasons why this Court should nonetheless find them credible. First, as discussed above in Section II.A, supra., apart from the Consent Search Waiver form, the rest of the officers' recollections surrounding their

16

interactions with Ms. Cruz have been consistent in all of their meetings with the government. Second, as soon as the officers realized their mistake regarding the Consent Search Waiver form, they advised the government. Third, the officers advised the government in spite of the fact that doing so made their case weaker. In other words, faced with the option of lying to present a stronger case or telling the truth to present a weaker one, they chose the latter. Finally, and most importantly, the officers have a reasonable and logical explanation for their mistake: lack of preparation. The government expects Det. Rogers and Det. Melanson will testify that they reviewed no documents prior to the April 24, 2006 meeting with the government. In particular, the government expects Det. Rogers to explain during his testimony that, having not prepared prior to the April 24, 2006 meeting, he assumed that he obtained a Consent Search Waiver form from his car because that is his normal procedure. Similarly, the government expects Sgt. Arahovites to testify that the first time he reviewed any documents relating to this case was during the pre-hearing witness preparation interviews on May 18, 2006. Although this lack of preparation may be far from exemplary, it does explain the officers initial error regarding the timing of the signed Consent Search Waiver form.

E.  ONCE INSIDE 15 BROOK STREET, THE SEARCH FOR THE DEFENDANT WAS WITHIN THE SCOPE OF MS. CRUZ'S CONSENT

Assuming this Court finds that the officers entered 15 Brook

Street only after Ms. Cruz voluntarily invited them in to look for the defendant, the ensuing search for the defendant was well within the scope of Ms. Cruz's consent.[3] As even the defendant admits, Ms. Cruz specifically gave the officers consent to come inside to look for the defendant. Def. Mot. [D.17] at 3, 8.

F.  THE GOVERNMENT RELIES ON ITS EARLIER SUBMISSION WITH RESPECT TO THE BAG OF BULLETS, THE BULLET TIED TO THE DEFENDANT'S SHOELACE, THE BOX OF BULLETS, AND THE DEFENDANT'S INCULPATORY STATEMENTS

After finding the defendant in the basement of 15 Brook Street, officers discovered a bag of bullets underneath a cushion on a small couch on which the defendant asked to sit. As the government argued in its first opposition to the defendant's motion to suppress, this bag of bullets was discovered pursuant to a search incident to a valid arrest. Gov. Opp. Mot. [D. 19] at 12-13. As the circumstances surrounding that search have not changed, the government relies on the arguments set forth in its

---

[3] The ensuing search may also fall under the protective sweep doctrine. See Maryland v. Buie, 494 U.S. 325, 327 (1990). The First Circuit has extended Buie to situations where officers enter a home under exigent circumstances. United States v. Martin, 413 F.3d 139, 149 (1st Cir. 2005). In doing so, the First Circuit relied in part on cases extending Buie to situations where officers entered a home with consent, as in this case. Martin, 413 F.3d at 150, citing with approval United States v. Garcia, 997 F.2d 1273, 1282 (9th Cir. 1993)(permitting protective sweep when police were lawfully present in a home by consent) and United States v. Patrick, 959 F.2d 991, 996 (D.C.Cir. 1992). In any event, the scope of Ms. Cruz's verbal and implied consent gave the officers ample justification to search 15 Brook Street for the defendant, notwithstanding the applicability of the protective sweep doctrine.

earlier submission.  Id.  Similarly, the circumstances surrounding the discovery of the box of bullets, the discovery of the bullet tied to the defendant's shoelace, and the inculpatory statements made by the defendant have not changed.  Accordingly, the government relies on the arguments set forth in its earlier submission.  Id. at 13-15, 20-21.

### III.  CONCLUSION

Notwithstanding the new evidence regarding the Consent Search Waiver form, the police had valid verbal and implied consent to enter 15 Brook Street and look for the defendant.  Accordingly, defendant's motion should be DENIED.

                                          Respectfully submitted,

                                          MICHAEL J. SULLIVAN
                                          United States Attorney

                                    By:  /s/ S. Waqar Hasib
                                          S. WAQAR HASIB
                                          Assistant U.S. Attorney

CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                <u>/s/ S. Waqar Hasib</u>
                                S. WAQAR HASIB
                                Assistant U.S. Attorney

Date: June 21, 2006