UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:05-CR-10213-NMG |
| | ) | |
| GEORGE L. MEDINA | ) | |
| | ) | |

**DEFENDANT'S POST-HEARING BRIEF**

On May 18, 2006, more than a year after Mr. Medina's arrest, the Government disclosed

exculpatory evidence regarding the search and seizures at issue. Government's Revised

Opposition to Defendant's Motion to Suppress at 1(hereinafter "Revised Opposition"). The

revelation of this evidence prompted the Government to abandon its reliance on the written

consent to search form secured by the police and to concede, "that there is reason to examine the

credibility of the Haverhill Police Department officers..." Id. at 1, 12-18. Mr. Medina agrees

that there is ample reason to scrutinize the credibility of the police officers in this case and

maintains that their testimony at the suppression hearing provides additional grounds to question

their versions of the events. Moreover, he maintains that the officers' contradictory testimony

makes it impossible for the Court to rely on their descriptions of the events surrounding the

search of 15 Brook Street. Thus, the evidence seized as result of the search must be

suppressed.[1]

---

[1] The Government has argued that Mr. Medina does not have 'standing' to invoke the
exclusionary rule in this case, relying on the terms of Ms. Cruz' lease and a novel interpretation
of the holding in Minnesota v. Olson, 495 U.S. 91 (1990) and United States v. Romain, 393 F.3d
63 (1st Cir. 2004). Government's Opposition to Defendant's Motion for Suppression and
Memorandum of Reasons at 18-20 (hereinafter "Government's Opposition"). This argument is
entirely without legal support and the Government's contention that its argument, "is not
inconsistent with the holding in Olson" is false. Government's Opposition at 19. In Olson, the
Supreme Court said, "[w]e need go no further than to conclude, as we do, that Olson's *status as
an overnight guest is alone enough* to show that he had an expectation of privacy in the home," a
holding that the First Circuit unequivocally applied in United States v. Jimenez and Romain.

A.    THE GOVERNMENT HAS FAILED TO SHOW VOLUNTARY CONSENT BY A PREPONDERANCE OF THE CREDIBLE EVIDENCE.

The Government notes that, "[t]he critical issue before this Court is and always has been whether the officers had valid consent to enter 15 Brook Street and look for the defendant." Revised Opposition at 11.  The Government has the burden to show, by a preponderance of the evidence, that the consent on which it seeks to rely was voluntary.  Id. (citing, Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006)); See also, Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).  To determine whether the Government has met its burden, the Court must examine the totality of the circumstances surrounding the purported consent.  See, Schneckloth, 412 U.S. at 248-49; See also, United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003).  Witness credibility is a factor to be considered in determining whether consent was voluntary.  United States v. Jahkur, 409 F.Supp.2d 28, 32 (D. Mass. 2005).

The four key officers in this case each recited their versions of written and verbal consent, respectively, on at least four separate occasions.  See, Exhibit A; Exhibit B.  Each officer's account of these issues has materially varied, both internally and in relation to the other officers' versions.  Id.  Given the space constraints of this brief, Mr. Medina will necessarily confine himself to highlighting the most significant discrepancies and variances.

---

Olson, 495 U.S. at 98 (emphasis added); Jimenez, 419 F.3d 34, 40 (1st Cir. 2005); Romain,393 F.3d at 68.  Mr. Medina's and Ms. Cruz' affidavits, and Ms. Cruz' testimony, clearly establish that Mr. Medina was an overnight guest falling within the unqualified rule of Olson.  Moreover, even if the Court were inclined to stray from the clear holding of Olson, the Government has failed to present any evidence that establishes a violation of Ms. Cruz' lease.  The Government presented no evidence  that Mr. Medina *in fact* exceeded the permitted number of overnight stays or that Ms. Cruz *did not* honor the terms of her lease.

2

With regard to written consent, for example, in April Detective Melanson told Assistant United States Attorney Waqar Hasib and Special Agent Sheila O'Hara that Jacqueline Cruz voluntarily signed a consent to search form "shortly after" the officers entered her home.  See, Exhibit A.  In June, after reviewing documents undermining this claim, he recanted it and asserted that the consent form was signed only after Mr. Medina had been arrested.  Id. In April Detective Rogers told Hasib and O'Hara that he obtained a written consent form for Ms. Cruz notwithstanding her alleged verbal invitation to the officers to enter her home.  Id.  In May, when a written consent theory was untenable, he told them that Arahovites knocked and announced "police" and then obtained verbal consent from Ms. Cruz to enter.  Id.  By June, however, he could say only that he "believe[d]" that Arahovites knocked and announced.  Id.

Regarding verbal consent, in April Sergeant Arahovites made no mention of it in his conversation with Hasib and O'Hara.  See, Exhibit B.  In May, concluding that written consent could not possibly have been obtained before the search for Mr. Medina, he provided an elaborate account of verbal consent in which he talked with a "calm" Ms. Cruz "through the screen door" on her porch.  See, Exhibit A; Exhibit B.  By June, however, Arahovites was telling his interviewers that Ms. Cruz' voice was "raised" when he spoke to her, and that the screen door was open when he did so.  See, Exhibit B.  And in July, his explanation to Ms. Cruz of the police presence at her house, which in previous accounts took place on the porch, now happened "in the foyer."  Id.

The examples *supra* illustrate the variety of materially different accounts of the consent alleged to have been given in this case.  Between them, they contain three different versions of the timing and circumstances of written consent.  As to verbal consent, Arahovites provides

three essentially different versions, while Rogers provides at least two. Thus, on these examples alone the Court has eight different consent scenarios to parse. In short, the Government has failed to prove voluntary consent by a preponderance of the credible evidence because the sheer multiplicity of materially different accounts of consent its witnesses have given makes it impossible for the Court to credit one version as against another.

Moreover, to the extent that there is any cohesive theory of consent from the Government's witnesses, it is born of necessity and incredible for that reason. The discernible trend in the officers' stories is the drift from reliance on written consent to the privileging of a verbal consent theory. See, Exhibit A; Exhibit B. In April, written consent assumed pride of place both in the officers' versions and in the Government's Opposition. See, Exhibit A; Government's Opposition at 3-4, 8, 10. In May, when documentary evidence conclusively demonstrated that written consent was not obtained prior to the search for Mr. Medina, the officers decided to rely on verbal consent. See, Exhibit B; Revised Opposition at 3-10, 12-14. In tandem with the voluminous inconsistencies in the officers' versions of how Ms. Cruz' consent was allegedly obtained, this sudden tactical switch renders the officers' claims of verbal consent unworthy of belief.

In contrast, Ms. Cruz' testimony was forthright and consistent. She was roused by a knock at her door and heard someone say, "say it's maintenance." Tr. 3-11. When she opened her inner door, the screen door was already open and two officers were standing inches from her, one with his foot in the doorframe. Tr. 3-12. She could not close her door. Tr. 3-13. Immediately after asking if Mr. Medina was in her home, the lead officer began "walking and talking," forcing Ms. Cruz into her home and permitting the officers' entry. Tr. 3-13, 14.

4

Although she had not invited the officers in, Ms. Cruz was now trapped by her bedroom as an officer continued to question her. Tr. 3-15. She gestured to her bedroom, telling the officer that he could see for himself that Mr. Medina was not there.[2] Tr. 3-16, 17, 20. During the course of this conversation, officers yelled from the basement that they had found Mr. Medina. Tr. 3-15. Ms. Cruz had not given the officers permission to enter the basement or any other part of her house. Tr. 3-16, 17.

As noted in the "Defendant's Motion to Suppress," the facts here are similar to, but more egregiously coercive than, those in United States v. Weidul, 325 F.3d 50 (1st Cir. 2003). Defendant's Motion to Suppress at 9-11. In contrast, the facts in this case are materially dissimilar to those in the authorities cited by the Government. Cf. United States v. Romain, 393 F.3d 63 (1st Cir. 2004) (police expressly invited into home by two women, one of whom had placed 911 call requesting their presence); United States v. Barnett, 989 F.2d 546 (1st Cir. 1993) (defendant with eighteen prior convictions not likely to be intimidated by show of force, was read Miranda rights, and thus could consent to search); United States v. Cepulonis, 530 F.2d 238 (1st Cir. 1976) (Cepulonis' prior history of violence and prior run-ins with police coupled with reading of Miranda put him on notice of rights); Robbins v. MacKenzie, 364 F.2d 45 (1st Cir. 1966) (unlocking and opening door for police, and walking back into room voluntarily, constitutes implied consent to enter; "To be distinguished are cases where the householder

---

[2]The defendant maintains that this statement was a mere acquiesence to authority occasioned by the officers' forcible entry into Ms. Cruz' home. Nevertheless, even if this statement is found to constitute voluntary consent, "the scope of the search is limited by the terms of its authorization." Walter v. United States, 447 U.S. 649, 65 (1980). Here, because of Ms. Cruz' location and her gesture, the scope of the authorization was clearly limited to her bedroom.

opens a door not knowing who is there and finds himself faced with armed authority. In such cases the act of opening the door may merely be to see who is there, and turning back may only be retreating."); United States v. Jahkur, 409 F.Supp. 28 (D. Mass. 2005) (defendant who asked for ride in police cruiser impliedly consented to search).

**B.    THE GOVERNMENT FAILED TO SHOW THAT THE EVIDENCE WAS DISCOVERED INCIDENT TO A LAWFUL ARREST, IN PLAIN VIEW, OR DURING A PROTECTIVE SWEEP.**

As with their accounts concerning consent, the officers' versions of the discovery of the evidence in this case vary significantly. See, Exhibit C. Arahovites, for example, testified that he did not see any ammunition in the basement. Id. Rogers, however, testified that Arahovites was standing right next to him when he discovered a pellet gun and bag of bullets in a sofa, and that he said "gun" to Arahovites upon his finding. Id. Rogers went on to say that he showed Arahovites the bag of bullets, and that Arahovites was present in the basement when he found the box of ammunition at the foot of the stairs. Id. Arahovites contradicted this by testifying that he and Medina were not in the basement when the ammunition was found. Id. Finally, although Rogers swore that he never brought Burrill to the basement, Burrill specifically contradicted him and testified that Rogers showed him both the ammunition and where it was found. Id.

These are but a few notable discrepancies from a record that is rife with inconsistencies. Id. Yet each and every of the legal theories on which the Government relies requires the Court to determine precisely how the evidence was discovered. The search incident to a lawful arrest theory requires the Court to determine the, "area within [the arrestee's] immediate control, [meaning] the area from within which he might gain possession of a weapon or destructible

6

evidence." Chimel v. California, 395 U.S. 752, 763 (1969).  Plain view requires the Court to decide, *inter alia*, that, "the officer...lawfully...reached the position from which he could plainly view the seized object," and that the officer had "a lawful right of access to the object itself." United States v. Jones, 187 F.3d 210, 219-221 (1st Cir. 1999).  Finally, in order to find that the evidence is admissible because discovered during a legitimate protective sweep, the Court must decide that the sweep was prompted by a reasonable suspicion of danger, that it did not exceed a cursory inspection of places where a person might be found, and that it lasted no longer than necessary to ameliorate any danger and remove Mr. Medina from the premises.  See, United States v. Martins, 413 F.3d 139, 149 (1st Cir. 2005).  But, as with the myriad versions of consent in this case, the numerous accounts of how the evidence was discovered make it impossible for the Court to confidently settle on any particular scenario.

## C.    THE POLICE MAY NOT MANUFACTURE EXIGENT CIRCUMSTANCES.

The officers agree that Mr. Medina was found in the anteroom to the basement moments after Rogers and Arahovites descended the stairs.  See, Exhibit C.  He was immediately arrested and handcuffed behind his back.  Id.  Both Arahovites and Rogers knew that they could exit directly outdoors from the anteroom, but chose instead to bring Mr. Medina back into the basement, where the evidence was ultimately discovered.  Id.

Arahovites' and Rogers' calculated creation of the circumstances on which the Government now relies to justify the discovery and seizure of the evidence in this case cannot be sanctioned.  United States v. Curzi, 867 F.2d 36. 42-43 (1st Cir. 1989); See also, United States v. Munoz-Guerra, 788 F.2d 295 (5th Cir. 1986); United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984); United States v. Torres, 274 F.Supp.2d 146 (D. Rhode Island 2003).  But for

their decision to bring Mr. Medina back through the basement rather than ferrying him immediately outside, the Government's rationales for search and seizure would have no application to this case. Mr. Medina's "grab area" under Chimel would have been confined to the anteroom, and the search of the sofa could not have been justified as incident to arrest. Nor would there have been any need for a "protective sweep" or security check of the sofa or a second sweep of the basement. Finally, Rogers would have had no occasion to discover the box of ammunition in "plain view." The police deliberately put themselves in the situation which they now claim gave rise to exigencies justifying their searches and seizures. The Fourth Amendment prohibits such subterfuges. Curzi, 867 F.2d 36.

## **CONCLUSION**

For the foregoing reasons and those articulated in his previous pleading, Mr. Medina's "Motion to Suppress Fruits of Illegal Search of Home and Statements" should be granted.

GEORGE L. MEDINA
By his attorney,


/s/ Stylianus Sinnis
Stylianus Sinnis
B.B.O. #
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

8

**EXHIBIT A - CONSENT FORM**

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---|---|---|---|---|
| **ARAHOVITES** | - Rogers gives him consent form prior to discovery of Medina. **Hearing Ex. 16.**<br><br>- Consent form signed prior to discovery of Medina. **Tr. p. 36.** | **- For all references,** *see* **Exhibit D, attached.**<br><br>- Tells Hasib and O'Hara that consent form signed before discovery of Medina.<br><br>- Identifies consent form, confirms that he signed, timed (10:45 a.m.), and dated (03/10/05) it.<br><br>- Sees booking form. Medina booked at 10:50 a.m.<br><br>- Tells Hasib and O'Hara consent form could not have been signed before Medina search. | **- For all references,** *see* **Exhibit E, attached.**<br><br>- Tells Hasib and O'Hara drove to May suppression hearing with Melanson and Rogers. They talked about case.<br><br>- Was "surprised" to see Corthell at May suppression hearing, but did not talk to him.<br><br>- Says "something was bothering him" about time (10:45 a.m.) on consent form at May interview. Believed that police left for 15 Brook Street at 9:00 - 9:30 a.m.<br><br>- After initial May meeting with Hasib and O'Hara, saw Medina booking form with time of 10:54 a.m. Concluded written consent form could not have been signed before Medina search.<br><br>- Tells Hasib and O'Hara that "99% of the time, a consent search waiver form is signed prior to going into a location to | - Admits discussing Computer Aided Dispatch (CAD) sheet with other officers at May suppression hearing. Says instructed others not to talk with Hasib and O'Hara until he rectified issue of timing of consent form. **Tr. p. 62.**<br><br>- Testifies arrived at 15 Brook Street at approximately 9:30 a.m. **Tr. p. 83.**<br><br>- Agrees CAD shows police at 15 Brook Street at 10:26:04 a.m. and that Medina arrested and warrant confirmed at 10:26:15 a.m., eleven seconds later. **Tr. pp. 46-47.**<br><br>- Testifies that consent form signed after Medina arrest to authorize search for gun. **Tr. p. 39.** |

**EXHIBIT A - CONSENT FORM**

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---|---|---|---|---|
| **ROGERS** | - During joint interview with Melanson, says retrieved consent form before he entered 15 Brook Street. **Hearing Ex. 16.**<br><br>- Says gave consent form to Arahovites, who had Cruz sign it in kitchen. **Hearing Ex. 16.** | **- For all references,** *see* **Exhibit D, attached.**<br><br>- First, cannot recall when consent form was signed. Admits was not sure in April that got form from his car and had it signed before search.<br><br>- Reinterviewed and says was not present for signing of consent form. May have gotten form from car before leaving, but not certain. | **- For all references,** *see* **Exhibit E, attached.**<br><br>- Tells Hasib and O'Hara that drove to suppression hearing with Melanson and Arahovites. They "may have" talked about case.<br><br>- Says did not talk with Corthell at May suppression hearing and "does not recall" reviewing CAD sheets.<br><br>- Claims first aware consent form signed after Medina search upon reviewing police report after May meeting with Hasib and O'Hara. | - Now "sure there probably was some talk" about case with Melanson and Arahovites prior to suppression hearing. **Tr. p. 126.**<br><br>- Was "surprised" to see Corthell at suppression hearing. **Tr. p. 127.**<br><br>- First says arrived at 15 Brook Street between 10:00-10:30 a.m., then says could have been 9:30 a.m. Finally, admits does not know time of arrival. **Tr. pp. 129-30.** |

<u>**EXHIBIT A - CONSENT FORM**</u>

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---|---|---|---|---|
| **MELANSON** | - During joint interview with Rogers, says form was signed "shortly after" entrance to 15 Brook Street. **Hearing Ex. 16.** | **- For all references, *see* Exhibit D, attached.** | **- For all references, *see* Exhibit E, attached.**<br><br>- Consent form signed after Medina arrested and transported to station. Claims not to remember being asked about timing of written consent in April.<br><br>- Drove to May suppression hearing with Rogers and Arahovites. Claims not to have talked to Corthell.<br><br>- Prior to May suppression hearing, reviewed police reports, CAD sheets, other paperwork with all other officers. | - Denies April statement that consent signed before Medina arrested. **Tr. 2 p. 16.**<br><br>- Admits knew Corthell was testifying at May suppression hearing before driving to court. Never told Hasib or O'Hara this. **Tr. 2 p. 27.**<br><br>- Before May suppression hearing, told other officers consent signed after Medina's arrest. Also raised issue of verbal consent with them. **Tr. 2 pp. 22, 50.** |

<u>**EXHIBIT A - CONSENT FORM**</u>

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---|---|---|---|---|
| **BURRILL** | - Arrived after Medina arrested. **Hearing Ex. 16.** | **- For all references,** *see* **Exhibit D, attached.**<br><br>- Provided consent form after Medina arrested so officers could search for gun. | **- For all references,** *see* **Exhibit E, attached.**<br><br>- Provided consent form to Rogers after Medina arrested so officers could search for gun. | - First claims that he told Hasib and O'Hara in April that he brought consent form for Cruz to sign, then admits he did not. **Tr. 2 pp. 67-69.**<br><br>- First denies officers met and discussed police report, CAD sheets, other paperwork prior to May suppression hearing. Then says officers talking in conference room, but did not hear any discussion of written or verbal consent. **Tr. 2 pp. 71-72, 80-81.** |

**EXHIBIT B – VERBAL CONSENT**

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---|---|---|---|---|
| **ARAHOVITES** | - No mention of verbal consent. **Hearing Ex. 16** | **- For all references,** *see* **Exhibit D, attached.**<br><br>- Arrives at 15 Brook Street with Melanson, Rogers. Knocks and announces "police."<br><br>- Speaks with Cruz "through the screen door." Identifies himself as police again.<br><br>- Cruz says Medina only visits "to get laid or get a piece of ass."<br><br>- Asks if police can come in and "look around the apartment for Medina." Cruz lets police in. Cruz is "calm." | **- For all references,** *see* **Exhibit E, attached.**<br><br>- He "opened the screen door to knock on the inner door."<br><br>- Voice asks "who is it?" and he says "police." Voice "may have" asked again and he said "John, Haverhill Police."<br><br>- Cruz opens inner door. Screen door "may have been partially open."<br><br>- Tells Cruz they "didn't want to bother her and were not interested in her."<br><br>- Cruz said that they could come in and "search all you want." Cruz' voice is "a little raised."<br><br>- Melanson checks bedroom and goes upstairs. Rogers goes to basement and he follows. | - Knocked twice before female voice said "who is it?" Opened the screen door and knocked on interior door. Melanson and Rogers immediately on either side of him. **Tr. pp. 53-54.**<br><br>- Explained purpose of police presence and object of search to Cruz "in the foyer." **Tr. pp. 67-68.**<br><br>- Concedes the "piece of ass" comment does not appear in Rogers' report. **Tr. pp. 50-51.** |
| **ROGERS** | - Says Cruz invited police in to look for Medina but he retrieved consent form anyway. No mention of "piece of ass" comment. **Hearing Ex. 16.** | - Arahovites knocked and announced "police." Cruz opened door.<br><br>- Arahovites again identified himself as police and asked if Medina present. Cruz makes "piece of ass" comment and lets police in. | - "Believes" that Arahovites knocked and announced.<br><br>- Cruz "may have opened the screen door and voluntarily let them into the apartment." | - Concedes "piece of ass" comment does not appear in his report. **Tr. p. 117.** |

1

EXHIBIT B - VERBAL CONSENT

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---|---|---|---|---|
| **MELANSON** | | **- For all references,** *see* **Exhibit D, attached.** | **- For all references,** *see* **Exhibit E, attached.**<br><br>- Arahovites identified them as police when Cruz came to door. Cruz invited them in.<br><br>- Arahovites then explained their presence to Cruz and "asked her if they could look around. Cruz told them to go ahead."<br><br>- He looked for Medina in living room and upstairs. | - Heard nothing of conversation between Arahovites and Cruz at front door. **Tr. 2 p. 32.**<br><br>- All officers discussed verbal consent at meeting before May suppression hearing. He raised the topic. **Tr. 2 pp. 29, 50.**<br><br>- Police were already in the kitchen when Arahovites asked if they could look around and Cruz agreed. This was the first time he heard any request for consent. **Tr. 2 pp. 34-35, 40.** |

Case 1:08-cv-10637-DPW   Document 30   Filed 07/27/2006   Page 1 of 3

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---------|-----------|----------|-----------|-----------|
| **ARAHOVITES** | | **- For all references,** *see* **Exhibit D, attached.**<br><br>- Followed Rogers to basement where Rogers discovered Medina in anteroom.<br><br>- Medina arrested and handcuffed in anteroom.<br><br>- Does not know if shoes were brought to Medina upstairs or downstairs.<br><br>- Search for gun took place after Medina transported to station. | **- For all references,** *see* **Exhibit E, attached.**<br><br>- Melanson checked bedroom and then went upstairs.<br><br>- Told Medina about warrant and Melanson called dispatch to confirm it.  He called for transport for Medina. | - Saw no one in basement upon entering and looking around. **Tr. pp. 68-69.**<br><br>- Medina found, handcuffed in back, brought straight upstairs. Confirmed warrant at 10:26:15 a.m.  **Tr. pp. 61-62.**<br><br>- Silver door in anteroom leads directly outside.  **Tr. p. 59.**<br><br>- Does not recall whether Medina put shoes on downstairs or upstairs but knows Medina did not sit down in basement.  **Tr. p. 60.**<br><br>- Did not see any ammunition, in plain view or recovered, in basement.  **Tr. p. 31.**<br><br>- Does not know if Melanson went down to basement.  **Tr. p. 55.** |

1

Case 1:03-cr-10363-PBS   Document 30   Filed 07/27/2006   Page 2 of 3

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---|---|---|---|---|
| **ROGERS** | | **- For all references,** *see* **Exhibit D, attached.**<br><br>- Went to basement, looked around, and proceeded to anteroom. Arahovites followed.<br><br>- Found, arrested, and handcuffed Medina and led him back into basement.<br><br>- Arahovites advised Medina of Miranda rights and confirmed warrant.<br><br>- Medina asks to sit on sofa so he removes cushion and finds pellet gun and bag of six bullets.<br><br>- Cruz brings Medina shoes with bullet tied on lace, which are seized. Second pair of shoes brought to Medina.<br><br>- Finds box of ammunition at bottom of stairs. | **- For all references,** *see* **Exhibit E, attached.**<br><br>- Melanson confirmed warrant.<br><br>- Might have said "gun" when he found pellet gun.<br><br>- Then looked around basement a second time to find box of ammunition.<br><br>- Cannot remember who brought Medina upstairs or whether shoes were brought to Medina upstairs or downstairs. Cannot remember who took Medina to transport cruiser.<br><br>- Did not see bullet tied to shoelaces until officer in booking area of police department remarked on it. | - Saw with a quick initial scan that no one was in basement. **Tr. p. 122.**<br>- Anteroom door leads directly outside. Chose to bring Medina back through basement. **Tr. pp. 124-25.**<br>- No one advised Medina of his rights. **Tr. p. 140.**<br>- First says Melanson never came downstairs, then says does not know. **Tr. pp. 119-20.**<br>- Never brought Burrill down to basement. **Tr. pp. 2-3.**<br>- Cannot remember if Medina sat down in basement. First cannot remember if shoes were brought to Medina in basement, then testifies that Medina did not put on shoes in basement. **Tr. p. 126.**<br>- Chose to sit Medina on sofa rather than safe folding chair. **Tr. pp. 135-37.**<br>- Arahovites standing right next to him when pellet gun, bag of bullets found. Said "gun" to Arahovites and showed him the bag of bullets. **Tr. pp. 133-34.**<br>- Arahovites and Medina still in basement when box of ammunition found. Ammunition found on right-hand side of stairs rather than left-hand side as per his original report. **Tr. pp. 135-37** |

Case 1:06-cr-10109-DPW   Document 30   Filed 07/27/2006   Page 3 of 3

| OFFICER | APRIL 2006 | MAY 2006 | JUNE 2006 | JULY 2006 |
|---|---|---|---|---|
| **MELANSON** | | - For all references, *see* **Exhibit D, attached.** | - For all references, *see* **Exhibit E, attached.**<br><br>- Heard capture of Medina in basement. Did not go downstairs. Stood at top of stairs.<br><br>- He confirmed warrant with dispatch.<br><br>- Cruz gave Medina shoes when Medina brought upstairs. He saw bullet on laces of shoes and Burrill seized shoes. | - Took three to five minutes to discuss consent with Cruz in kitchen despite concern Medina would flee. **Tr. 2 pp. 39-40.**<br><br>- Did not bring shoes to basement as stated in Government's Opposition. **Tr. 2 pp. 31-32.**<br><br>- Cannot remember if Cruz gave Medina shoes downstairs or upstairs. **Tr. 2 p. 33.**<br><br>- Did not see pellet gun or any ammunition recovered in basement. **Tr. 2 p. 32.** |
| **BURRILL** | - Arrived at 15 Brook Street after Medina arrested. **Hearing Ex. 16.** | - Arahovites confirmed warrant with dispatch.<br><br>- Medina in handcuffs upstairs when he arrived.<br><br>- Cruz brought Medina shoes upstairs. Burrill saw bullet on laces and seized them. Second pair of shoes provided to Medina. | - Met Rogers at the front door of 15 Brook Street.<br><br>- Went to basement with Rogers. Medina still in basement, handcuffed.<br><br>- Rogers showed him where pellet gun and ammunition were discovered. Property itself already seized.<br><br>- Medina brought upstairs to kitchen where he asks Cruz for shoes. | - Rogers brought him to basement on arrival and Rogers' recollection to contrary is inaccurate. **Tr. 2 p. 65.**<br><br>- Rogers showed him where ammunition found and Rogers' recollection to contrary is inaccurate. **Tr. 2 p. 67.**<br><br>- Rogers showed him ammunition itself and Rogers' recollection to contrary is inaccurate. **Tr. 2 p. 67.** |

3

# EXHIBIT
# D

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation:<br>Jorge MEDINA | Investigation Number:<br>762025-05-0063 | Report Number:<br>6 |
|---|---|---|

## SUMMARY OF EVENT:

Haverhill Police Department officers interviewed prior to Motion to Suppress Hearing.

## NARRATIVE:

1. On Thursday, May 18, 2006, a Motion to Suppress the evidence in this case was scheduled to take place at 1:00 PM before Judge Nathaniel Gorton, US District Court, Boston, MA. On April 24, 2006, Assistant US Attorney Waqar Hasib and Special Agent Sheila O'Hara previously met with Haverhill PD Lt. Kevin Dorr, detectives Robby Rogers and Gary Melanson, at Haverhill PD in preparation for the Suppression Hearing. S/A O'Hara did not take any notes from this original meeting. Detectives Rogers and Melanson seemed to recall that someone else may have been present or arrived at the location of the arrest (15 Brook Street), but they could not remember who it may have been. At this time, Det. Rogers believed that he provided the Haverhill PD Consent Search Waiver form to Sgt. Don Aravites prior to the officers searching the premise for defendant George MEDINA. He said that he always keeps these forms in his car and that the other officers did not.

2. On May 18, 2006, the Haverhill officers met individually with AUSA Hasib to review their testimony prior to the hearing. S/A O'Hara did not take notes during this meeting. Sgt. Aravites stated that Sgt. Dana Burrill requested his assistance in locating a shooting suspect by the name of George MEDINA. Sgt. Burrill further advised that there was an active warrant for MEDINA for motor vehicle violations. Sgt. Burrill directed Sgt. Aravites to 15 Brook Street as a possible location for MEDINA. It was believed that this was MEDINA's girlfriend's apartment.

3. Sgt. Aravites advised that he and detectives Rogers and Melanson went to the front door of 15 Brook Street, and that he knocked on the door and announced police. He said that a Hispanic female opened the door and that he spoke with her through the screen door. He stated that he again identified himself as police and asked if George MEDINA was there. She told officers that MEDINA was not there and did not stay there. She said that MEDINA only came by when "he wanted to get laid or get a piece of ass," or words to that affect. Sgt. Aravites asked the woman if they could come in and look around the apartment for MEDINA. She told the officers that they could and voluntarily let them into the apartment. S/A O'Hara asked Sgt. Aravites if they pushed or forced their way into the apartment or made any threats towards the female to gain entry into the apartment. He said no and that the woman was very calm and cooperative with the police. S/A O'Hara asked if the officers had their weapons drawn and he said that he did not have his drawn and does not believe that the either of the detectives

| Prepared by:<br>Sheila M. O'Hara | Title:<br>Special Agent, Boston IV Field Office | Signature: | Date:<br>06/02/06 |
|---|---|---|---|
| Authorized by:<br>Kenneth J. Croke | Title:<br>Group Supervisor, Boston IV Field Office | Signature: | Date:<br>6/2/3 |
| Second level reviewer (optional):<br>Glenn N. Anderson | Title:<br>Special Agent in Charge, Boston Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| Jorge MEDINA | 762025-05-0063 | 6 |

had their weapons out either. Sgt. Aravites initially believed that the Consent Search Waiver form was voluntarily signed by the women in the kitchen area prior to the officers looking for MEDINA in the apartment and that he received the form from Det. Rogers. He believed that Det. Rogers gave him the form and left the kitchen area as it was a small room. He thinks that Det. Rogers went to the hall area to be on the look-out for any additional people possibly in the apartment. He identified a copy of the Consent Search Waiver form signed by Jacqueline Cruz (MEDINA'S girlfriend), himself and Det. Melanson. He said that he dated and timed the form (03/10/04, 10:45AM)

4. Sgt. Aravites stated that he followed Det. Rogers into the basement area of the apartment. He believes that his weapon may have been drawn at this time, but was held down by his leg. He said that he heard Det. Rogers in a back room area saying "police, don't move, let me see your hands," or words to that affect. He observed MEDINA on the floor in this back room area and this is where MEDINA was handcuffed and arrested. He recalled shoes were brought to MEDINA, but could not recall if that took place upstairs or down in the basement. He advised that after MEDINA was located and arrested on the outstanding motor vehicle violations and was transported to the police department, officers began searching the apartment for the firearm that was used in the shooting under investigation by Sgt. Burrill. Sgt. Aravites stated that he did not locate any additional evidence during the consent search of the apartment.

5. Det. Robby Rogers stated that he went to 15 Brook Street with Sgt. Aravites and Det. Melanson in order to locate George MEDINA who was a suspect in a shooting incident. He said that Sgt. Burrill directed them to 15 Brook Street as a possible location for MEDINA. He advised that Sgt. Aravites knocked on the door and announced police. He said that a Hispanic female opened the door and that Sgt. Aravites again identified them as police officers and asked if MEDINA was in the apartment. Det. Rogers could hear her say that MEDINA was not there and that she only saw him when he wanted "to get a piece of ass," or words to that affect. He heard Sgt. Aravites ask if they could come in and that she let them into the apartment. S/A O'Hara asked him if they pushed themselves into the apartment or made any threats to gain entry into the apartment. He said no and advised that her demeanor was very calm and that she was very helpful.

6. AUSA Hasib showed Det. Rogers a copy of the signed Consent Search Waiver form. At this time he could not recall when the form was signed. He said that he must have retrieved the form from his car because he always carries these types of police forms in his car and that Aravites and Melanson did not, but he could not recall why he did not actually sign the form as a witness. He was not as sure as he was during the April 24th meeting that he retrieved the form from his car and that it was signed prior to the search, as that was the usual practice. He said that he must have done so because he is the only one of that group who carries the forms in his police cruiser, but that it did not explain why he did not sign the form.

7. Det. Rogers said that he went down to the basement area and that Sgt. Aravites followed shortly after him. He said that he looked around the basement area and then went to a back room area that led to a bulkhead door to the outside. He advised that he located MEDINA lying on the floor up against the wall covered with some rags in this back room area. Det. Rogers got Sgt. Aravites attention and pointed to where MEDINA was hiding. He identified himself and yelled for him to not move and to show his hands. He said that he then handcuffed MEDINA and escorted him to the basement area. He believes that Sgt. Aravites advised MEDINA of his rights, but that he was not questioned at this time. He further believes that Sgt. Aravites may have confirmed the outstanding arrest warrant for MEDINA. MEDINA requested to sit in a large chair/sofa. Before allowing MEDINA to sit, he checked the cushion and found

ATF EF 3120.2 (10-2004)
For Official Use Only

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| Jorge MEDINA | 762025-05-0063 | 6 |

what officers believed was a revolver (later identified as a pellet gun) and 6 rounds of .22 caliber ammunition in a plastic bag. He believes that MEDINA'S girlfriend brought some sneakers to MEDINA and he observed a .22 caliber bullet tied into the laces of the sneakers. MEDINA was not allowed to wear those shoes and another pair was brought to him. Det. Rogers said that he also found a box of .22 caliber ammunition at the bottom of the stairs and he took that into evidence as well.

8. Sgt. Aravites requested to speak with AUSA Hasib and S/A O'Hara again. He had with him a copy of the booking form for George MEDINA. He pointed out the time of the booking form as 10:50 AM and advised that the Consent Search Waiver form had the time of 10:45 AM. He said that could not have happened if the form was signed prior to officers being allowed to look for MEDINA. He said that after reviewing the times on the Consent and booking forms, the officers received verbal consent from Jacqueline Cruz to look for MEDINA and that they received the written and signed consent from her to look for the firearm or other possible evidence related to the shooting investigation. He believes he may have received the Consent Search Waiver form from either Sgt. Burrill or Det. Rogers.

9. Det. Rogers was re-interviewed regarding the Consent Search Waiver form. He advised at this time that the reason he did not sign the form was because he was not there. He said that he followed the marked cruiser that was transporting MEDINA to the police department for booking and that he was present at the time of booking. He advised that they received verbal consent to look for MEDINA from the girlfriend and that he was not present when the written Consent form was signed. He said he may have retrieved the form from his car prior to leaving and gave it to either Sgt. Burrill or Sgt. Aravites, but he was not certain about this.

10. Sgt. Dana Burrill was interviewed next. He stated that he was investigating a shooting incident from the previous night and had developed information that George MEDINA may have been involved. He said that he requested assistance from Sgt. Aravites to locate MEDINA for questioning on the shooting incident. He said that he provided the 15 Brook Street address as a possible location MEDINA and advised Sgt. Aravites that MEDINA had an outstanding arrest warrant.

11. Sgt. Burrill stated that he was at another location when he heard a radio call from Sgt. Aravites requesting confirmation for the MEDINA arrest warrant. He proceeded to 15 Brook Street where he observed MEDINA in handcuffs upstairs. He said that MEDINA's girlfriend brought a pair of sneakers to MEDINA. Sgt. Burrill advised that he observed a .22 caliber bullet tied into the laces of the sneakers and told the girlfriend to get another pair of shoes for MEDINA. Sgt. Burrill said that the sneakers were taken into evidence and that another pair of shoes was brought to MEDINA.

12. Sgt. Burrill stated that he provided the Consent Search Waiver form to Sgt. Aravites so that the officers could search the apartment for the weapon used in the shooting incident that he was investigating. He said that he then departed 15 Brook Street and followed the cruiser transporting MEDINA to the police department.

ATF EF 3120.2 (10-2004)
For Official Use Only

# EXHIBIT
# E

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: Jorge MEDINA | Investigation Number: 762025-05-0063 | Report Number: 9 |
| --- | --- | --- |

**SUMMARY OF EVENT:**

Report of interview with Sgt. Dana Burrill, Haverhill Police Department

**NARRATIVE:**

1. On Monday, June 5, 2006, Assistant US Attorney Waqar Hasib and Special Agent Sheila O'Hara interviewed Sgt. Dana Burrill at the Haverhill Police Department. Sgt. Burrill was not present for the April 24th meeting and recalls a brief telephone call with AUSA Hasib and S/A O'Hara. Sgt. Burrill stated that he was investigating a shooting incident which took place on the evening of March 9, 2005 in Haverhill, MA. He said that police received anonymous information that George MEDINA was the shooter and that MEDINA might be at his girlfriends apartment, 15 Brook Street, Haverhill, MA. He advised that he requested Sgt. Arahovites to look for MEDINA at the 15 Brook Street apartment and also advised Sgt. Arahovites that there was an outstanding arrest warrant for MEDINA for a motor vehicle violation. He further advised that he printed out a copy of the outstanding arrest warrant and gave it to Sgt. Arahovites.

2. Sgt. Burrill stated that he was either someplace else or in his car when he heard a radio transmission attempting to confirm an outstanding arrest warrant for George MEDINA. He said that he proceeded to 15 Brook Street after hearing that police transmission and recalls meeting Det. Rogers by the front door. Det. Rogers advised Sgt. Burrill that they found MEDINA in the basement and led him to the basement area where he believes MEDINA was still located and in custody. He was also shown where officers had located the pellet gun and ammunition and that the property was already in custody.

3. Sgt. Burrill stated that MEDINA was brought upstairs to the kitchen area and that MEDINA asked his girlfriend for his shoes. Sgt. Burrill said that he noticed a bullet tied into the laces of the shoes the girlfriend brought to MEDINA. He told the girlfriend to get another pair of shoes for MEDINA because he was taking those shoes into custody. He advised that he observed MEDINA's girlfriend, Jackie Cruz while at the scene. He said that she was very calm, and did not display any hysterics or crying.

4. Sgt. Burrill stated that he was the person who provided the written Consent Search Waiver form. He believes that he gave the form to Det. Rogers. Sgt. Burrill advised that he wanted the officers get permission from MEDINA's girlfriend to search for any evidence regarding the shooting incident he was investigating. He said that MEDINA was transported back to the police station and that he drove his car back to the station. He did not know how Det. Rogers returned to the station but advised that they were the ones who booked MEDINA at the station after Lt. Dorr advised MEDINA of his Miranda Rights. He further advised

| Prepared by: Sheila M. O'Hara | Title: Special Agent, Boston IV Field Office | Signature: | Date: 06/19/06 |
| --- | --- | --- | --- |
| Authorized by: Kenneth J. Croke | Title: Group Supervisor, Boston IV Field Office | Signature: | Date: 6/19/06 |
| Second level reviewer (optional): Glenn N. Anderson | Title: Special Agent in Charge, Boston Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

| Investigation Number: | Report Number: |
|---|---|
| 762025-05-0063 | 9 |

that during the booking process MEDINA told the officers that he always carries 6 bullets with, but did not elaborate as to why. MEDINA also told officers that he was willing to speak with them. Sgt. Burrill stated that when he was brought upstairs for a tape recorded interview, Sgt. Burrill did not question MEDINA much on the evidence found at the 15 Brook Street apartment. Sgt. Burrill said that he was more interested in the shooting incident he was investigating and really did not care much about the ammunition found with MEDINA because it is only a misdemeanor charge in Massachusetts.

5. Sgt. Burrill listened to the Haverhill PD radio transmissions regarding the arrest of MEDINA and identified his voice as notifying the dispatcher of seized property.

ATF EF 3120.2 (10-2004)
For Official Use Only

06-20-2006   04:32pm   From-US ATTORNEY'OFFICE ECONOMIC CRIMES UNIT   6177483960       T-201   P.005   F-669

U.S. Department of Justice
· Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: Jorge MEDINA | Investigation Number: 762025-05-0063 | Report Number: 10 |
|---|---|---|

## SUMMARY OF EVENT:

Interview with Det. Gary Melanson, Haverhill Police Department

## NARRATIVE:

1. On Monday, June 5, 2006, Assistant US Attorney Waqar Hasib and Special Agent Sheila O'Hara interviewed Det. Gary Melanson at the Haverhill Police Department. Det. Melanson stated that he recalls the Consent Search Waiver form was signed after George MEDINA was arrested. He said that he does not recall being asked that question during the April 24th meeting. He advised that in the Narcotics Unit, they usually get consent prior to searching or they already have a search warrant. He further advised that he did not review any reports prior to meeting with AUSA Hasib and S/A O'Hara for that April meeting.

2. Det. Melanson stated that he read Det. Rogers report for the first time on the drive down to the federal courthouse in May. He also said that he drove down to the courthouse with Det. Rogers and Sgt. Arahovites and did not speak with Officer Fred Corthell. He said that after Sgt. Arahovites came out from talking with AUSA Hasib and S/A O'Hara, he was upset about saying that the Consent Search Waiver form was signed prior to going into the apartment and that Sgt. Arahovites was unsure of the times. Det. Melanson said that after Sgt. Arahovites came out he read Sgt. Burrill's report for the first time which indicates that MEDINA was found first and then the consent form was signed. He advised that this was also the first time he saw any CAD sheets. He said that the officers started going through all of the paperwork and reports to try and determine the times.

3. Det. Melanson stated that he recalls the day that Sgt. Arahovites, Det. Rogers and himself went to 15 Brook Street to look for MEDINA. He said that he could not hear all of the conversation taking place at the door, but does recall Sgt. Arahovites identifying them as police when the female (Jackie Cruz) came to the door. He said that they did not use any ruse to gain entrance into the apartment and remembers Cruz inviting them in to the apartment. He said that he did not have his gun and that there were no raised voices. He said that Cruz was calm and relaxed and was never crying. He remembers Sgt. Arahovites explaining to Cruz why they were there and asked her if they could look around. Cruz told them to go ahead.

4. Det. Melanson stated that he looked into a small living room on the first floor and then proceeded upstairs and that he was looking for MEDINA. He said that he heard that MEDINA was found downstairs in the cellar. He did not recall going downstairs, but standing at the stairs. He advised that MEDINA was brought upstairs and that Cruz brought MEDINA a pair of shoes. He further advised that he saw a bullet tied in the

| Prepared by: Sheila M. O'Hara | Title: Special Agent, Boston IV Field Office | Signature: | Date: 06/15/06 |
|---|---|---|---|
| Authorized by: Kenneth J. Croke | Title: Group Supervisor, Boston IV Field Office | Signature: | Date: 6/15/06 |
| Second level reviewer (optional): Glenn N. Anderson | Title: Special Agent in Charge, Boston Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

762025-05-0063

Report Number:
10

laces of those shoes and that Sgt. Burrill took the first pair of shoes into custody.

5.  Det. Melanson stated that after MEDINA departed the scene and was transported to the police station, Sgt. Arahovites gave the Consent Search Waiver form to Cruz. He believes they were in the kitchen area and that Cruz signed the form. He said that there was no conversation about her housing situation and that she was compliant and cooperative. He advised that after she signed the Consent Search Waiver form, he went upstairs to look for any evidence regarding the shooting incident but did not find anything. He could not recall what other officers were there for the consent search.

6.  Det. Melanson listened to the police radio transmissions regarding the arrest of MEDINA and identified his voice as the one that called the police dispatcher to confirm the outstanding arrest warrant for MEDINA. He said that he does not have a specific memory of making that call but that it is definitely his voice making the call.

ATF EF 3120.2 (10-2004)
For Official Use Only

06-20-2006    04:33pm    From-US ATTORNEY'OFFICE ECONOMIC CRIMES UNIT    6177483960    T-201  P.007    F-669

U.S. Department of Justice                                      **Report of Investigation**
. Bureau of Alcohol, Tobacco, Firearms and Explosives

| Title of Investigation: Jorge MEDINA | Investigation Number: 762025-05-0063 | Report Number: 8 |
|---|---|---|

## SUMMARY OF EVENT:

Report of interview with Sgt. Don Arahovites, Haverhill Police Department.

## NARRATIVE:

1. On Monday, June 5, 2006, Assistant US Attorney Waqar Hasib and Special Agent Sheila O'Hara interviewed Sgt John Arahovites at the Haverhill Police Department. Sgt. Arahovites was not present for the April 24th meeting and recalls a brief telephone call with AUSA Hasib and S/A O'Hara. He advised that he does not recall speaking with anyone from the US Attorney's office or ATF about this case any time last year. He said that he did not review any reports or review any material prior to the May 18th meeting at the federal courthouse. He further advised that he intended to review the reports on the car ride down to the courthouse, but that he did not have copies with him. He said that he drove down with Dets. Melanson and Rogers and that they may have briefly talked about the case but were mostly talking small talk on the way down. He recalls that he even fell asleep for a time in the car.

2. Sgt. Arahovites stated that he did not know that Officer Fred Corthell was coming to the May 18th meeting and that he was surprised to see him in the lobby. He asked Corthell what he was doing there and that Off. Corthell said "he didn't know and that he was summonsed by the defense," or words to that affect. He did not have any discussion with Corthell about the case.

3. Sgt. Arahovites stated that after his initial meeting with AUSA Hasib and S/A O'Hara on May 18th, something was bothering him about the time on the signed Consent Search waiver form. He noted that it was timed at 10:45 AM, but believed they were at 15 Brook Street earlier than that. He believes they may have left the PD for Brook Street around 9:00-9:30 AM. He said after this initial meeting he reviewed the Haverhill PD booking sheet which had 10:54 AM as the booking time, so they could not have received the signed Consent Search waiver form before they went in to look for Jorge MEDINA. He said that 99% of the time, a consent search waiver form is signed prior to going into a location to search.

4. Sgt. Arahovites stated that prior to leaving the PD for Brook Street, Sgt. Burrill gave him a computer printout with the outstanding warrant for MEDINA and that he took that printout with him to 15 Brook Street. He advised that they walked up to the door and that he opened the screen door to knock on the inner door. He does not recall seeing anyone looking out any of the windows while they waited on the porch. He said that a voice inside asked "who is it?" and he replied "Police." The voice may have asked

| Prepared by: Sheila M. O'Hara | Title: Special Agent, Boston IV Field Office | Signature: | Date: 06/19/06 |
|---|---|---|---|
| Authorized by: Kenneth J. Croke | Title: Group Supervisor, Boston IV Field Office | Signature: | Date |
| Second level reviewer (optional): Glenn N. Anderson | Title: Special Agent in Charge, Boston Field Division | Signature: | Date |

ATF EF 3120.2 (10-2004)
                                                    For Official Use Only

Investigation Number:
762025-05-0063

Report Number:
8

who is it again and he responded "John, Haverhill Police." He advised that a female opened the inner door and that the screen door may have been partially open so he could knock on the inner door. He again identified himself as Haverhill police and that they were there looking for Jorge MEDINA. He said that she was emphatically saying that MEDINA was not there and that they could look around for him. She told them that he only comes over when he wants to get a piece of ass or get laid. Sgt. Arahovites told her that they didn't want to bother her and were not interested in her, but that they had information that MEDINA was there, that they had a warrant for him and also wanted to talk with him about an incident. He asked her if she would mind if they came in and looked around for him. He said that she told them that he was not there but if they wanted to come in they could and search all you want. He advised that this conversation took place while they were still on the porch and that it took less than 5 minutes and that she willingly let them in and allowed them to look around the apartment for MEDINA. He did not believe there were any language problems and that she fully understood everything he said to her and that he understood her responses. He did advise that her voice was a little raised but that the conversation was very civil.

5. Sgt. Arahovites stated that she invited them inside the apartment and that you could almost see the entire first floor from inside the door. He believes that Det. Melanson took a quick peak in what he thought was a first floor bedroom and then went upstairs. He advised that Det. Rogers went right down the basement stairs and that he followed. He believes that his gun was drawn but down by the side of his leg. He further advised that Det. Rogers gets his attention, by saying something over here and then hears Det. Rogers saying police get out, get out, let me see you hands. He stated that Det. Rogers then handcuffed MEDINA and that Sgt. Arahovites told MEDINA about the arrest warrant. He said that someone called back to the PD to confirm the warrant, which is the usual practice even if you have a warrant in hand. He also recalled a radio transmission about a transport cruiser for MEDINA. He advised that MEDINA was not spoken with at the scene about the shooting incident under investigation. He said that they had a warrant for him and that they went to 15 Brook Street to arrest MEDINA on the warrant as a favor to Sgt. Burrill.

6. Sgt. Arahovites then listened to the turret tape for this incident. He identified Det. Melanson as the individual who confirmed the warrant and that it was his voice requesting the cruiser to 15 Brook Street for transportation.

7. Sgt. Arahovites stated that she was not hysterical or upset after they found MEDINA in the basement. He said that he had a brief conversation with her about "you told us he wasn't there and he was," or words to that affect. He then asked her if she would mind if they looked around for a gun and she said no. He advised that prior to looking for the gun or any evidence regarding the shooting incident, he had her sign a Consent Search waiver form giving them permission to search. He could not recall who gave him the form, but someone gave it to him and he had her sign it. He said that she was not pressured or threatened in to signing the form in any way and that he was actually surprised at how cooperative she was with the police.

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: Jorge MEDINA | Investigation Number: 762025-05-0063 | Report Number: 7 |
|---|---|---|

## SUMMARY OF EVENT:

Interview with Det. Robby Rogers, Haverhill Police Department

## NARRATIVE:

1. On Monday, June 5, 2006, Assistant US Attorney Waqar Hasib and Special Agent Sheila O'Hara interviewed Det. Robby Rogers at the Haverhill Police Department. Det. Rogers was very apologetic about the information he initially provided during the April 24, 2006 meeting. He advised that he was not aware at the time that it was a prep session for a Motion to Suppress evidence in federal court and thought that it was only an informal meeting. He said that he had not read any police reports or reviewed any material prior to this first meeting and that what he stated during that first meeting was his usual practice and procedures during like situations. He further advised that he recalls only looking briefly at the report he prepared after the Jorge MEDINA arrest at that first meeting. His report does not mention the Consent Search Waiver form signed by Jacqueline Cruz. He advised that he only covered the arrest of MEDINA in his report, not the written consent search waiver form (see attached copy of Haverhill PD Incident Report #5005473). He further advised that the department does not require a report to be written regarding an arrest like this and that he wrote the report for Sgt. Burrill.

2. Det. Rogers stated that on Thursday, May 18, 2006, he drove down to federal court with Det. Melanson and Sgt. Arahovites. He does not recall what specifically they spoke about, that they may have briefly mentioned the case but more or less had a general conversation on the ride down. He advised that he did not talk with the dispatcher Fred Cortheell and did not even know he was going to be there. He further advised that he does not recall looking at the CAD sheets that Corthell brought down with him that day. He said that the CAD sheets are not routinely printed and put in case files, and that you have to specifically request any CAD printouts.

3. Det. Rogers stated that after the meeting, "his head was spinning" and he was concerned that he may have inadvertently messed up the case. Det. Rogers said that he reviewed Sgt. Burrill's report when he finished his meeting with AUSA Hasib on Thursday, May 18th. Sgt. Burrill's report states that Det. Melanson and Sgt. Arahovites received the signed consent search form to look for the weapon that was used in a shooting incident (see attached copy of Haverhill PD Incident Report #5005418-2). He said that was the first time he realized that the information he had previously reported was inaccurate. He again stated that what he previously told federal investigators was the common practice and procedure for his unit (the drug unit). He said that they usually have a search warrant when they go to a location,

| Prepared by: Sheila M. O'Hara | Title: Special Agent, Boston IV Field Office | Signature: | Date: 06/15/06 |
|---|---|---|---|
| Authorized by: Kenneth J. Croke | Title: Group Supervisor, Boston IV Field Office | Signature: | Date: 6/15/06 |
| Second level reviewer (optional): Glenn N. Anderson | Title: Special Agent in Charge, Boston Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004) For Official Use Only

but if they don't and they try to get a consent search from an occupant, he is the one that has the forms in his car and it is signed prior to the search. That is the way he usually conducts business and why he believed that it happened this way on this case prior to reading and reviewing any reports.

4. Det. Rogers listened to the Haverhill PD turret tape from this incident. He advised that his voice was not on the tape and that it sounded like Det. Melanson voice confirming the warrant with dispatch.

5. Det. Rogers stated that he went to 15 Brook Street with Sgt. Arahovites and Det. Melanson. He believes that it was Sgt. Arahovites who knocked on the door and announced police. He said that Sgt. Arahovites had a conversation with the female occupant, Jacqueline Cruz. He did not recall having any conversation with her. He heard Sgt. Arahovites tell Jackie that they were the police, that they were looking for Jorge MEDINA and asked if they could come in and look around for him. He recalled Jackie saying that MEDINA was not there, that he was an asshole, only came around to get laid and to come in and look for him. He recalls that she may have opened the screen door and voluntarily let them into the apartment.

6. Det. Rogers stated that he proceeded to the basement area followed by Sgt. Arahovites. He said that he did not have his weapon drawn and that he took a quick look around the open basement area. He then went to the back room area that had a bulkhead to the outside. He advised that he saw someone lying on the ground along a wall partially covered by rags. He further advised that he motioned to Sgt. Arahovites and that he then yelled "police, let me see your hands," or words to that affect. Det. Rogers said that MEDINA originally would not open his hands and that there was a brief struggle to get MEDINA to open his hands. He advised that MEDINA was handcuffed and brought into the open basement area where MEDINA asked to sit down. Prior to allowing MEDINA to sit down, Det. Rogers searched the sofa chair and found the pellet gun and a plastic bag with 6 rounds of .22 caliber ammunition. He believes he may have said, "Gun," when he found the pellet gun. He then looked around the basement again and that is when he saw the box of .22 caliber ammunition next to the bottom of the basement stairs.

7. Det. Rogers could not recall who brought MEDINA upstairs or if MEDINA's shoes were brought to him upstairs or downstairs. He was also unsure of who escorted MEDINA from the house to the police cruiser for transportation to the PD. He recalls someone in the booking area saying something about, "stupid f*#@ with this," or words to that affect, and seeing the bullet tied into MEDINA's shoe laces. He did not have a specific memory of Lt. Dorr reading MEDINA his Miranda Rights, but was present with Sgt. Burrill during the interview with MEDINA. He did not remember what was specifically said as he did not take any notes and only prepared a brief report after the arrest in which he did mention some of the statements made by MEDINA during the interview. He advised that he only reviewed Sgt. Burrill's report up to the arrest of MEDINA and did not review the report regarding the interview with MEDINA.

ATTACHMENTS:

Copy of Haverhill PD Incident Report #5005473 (Rogers report)
Copy of Haverhill PD Incident Report #5005418-2 (Burrills report)

ATF EF 3120.2 (10-2004)
For Official Use Only