UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
V.                       )        CRIMINAL NO. 05-CR-10213-NMG
                         )
GEORGE L. MEDINA         )
a/k/a JORGE L. MEDINA    )

## GOVERNMENT'S POST-HEARING MEMORANDUM IN OPPOSITION OF DEFENDANT'S MOTION TO SUPPRESS

As instructed at the end of the evidentiary hearing in the above-referenced matter, the government submits this post-hearing memorandum in opposition to defendant's motion to suppress.

### ARGUMENT

At the outset, the government readily concedes that the officers involved in this case made mistakes.  Most notably, they failed to prepare adequately for their pre-hearing meetings in April and May with the U.S. Attorney's Office (USAO) and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and they failed to recognize their error regarding the timing of a search and seizure waiver form until the day they were originally scheduled to testify in this matter.

But the critical issue before this Court is and always has been to determine what happened on the porch of 15 Brook Street. With respect to that critical issue, the officers' recollections of their interactions on the porch with Ms. Cruz have been largely consistent with each other and over time.  Those facts clearly point to one conclusion: that Ms. Cruz gave the officers valid,

1

voluntary consent while on the porch to enter 15 Brook Street and look for the defendant.

## I.    THE TESTIMONY OF THE OFFICERS ABOUT THEIR INTERACTIONS ON THE PORCH WITH MS. CRUZ IS CONSISTENT

During the evidentiary hearing, Sgt. Arahovites, Det. Rogers, and Det. Melanson offered consistent, though not identical, recollections of their interactions on the porch with Ms. Cruz. All three testified that they were working together that morning, and that they went to 15 Brook Street at the request of Sgt. Burrill.  I:8,20-24; II:5,13-14; III:13,5-6.[1]  All three recalled being dressed in plain clothes.  I:9,14-16; II:6,4-12; III:13,13-22.  All three testified that they arrived at 15 Brook Street in at least one unmarked car, though they may have used two such cars that day.  I:8,25-9,7; II:5,15-20; III:13,5-12.  All three testified that Sgt. Arahovites approached the front door on the porch and knocked.  I:12,7-9; II:6,19-23; III:13,23-14,4.  Two officers testified that after knocking, Sgt. Arahovites identified himself as a Haverhill police officer, while the third officer, Det. Melanson, could not recall what if anything was said. I:12,10-13,1; II:7,7-20; III:14,11-14.

Two officers, Sgt. Arahovites and Det. Rogers, testified that Ms. Cruz opened the main door to 15 Brook Street, though there was some difference between them as to whether the screen door was open

---

[1] The citation"I:8,20-24," refers to transcript volume I, page 8, lines 20-24, while "III:13,32-14,4" refers to volume III, page 13, line 32 through page 14, line 4.

or closed.  I:13,2-4; II:8,2-17.  The same two officers testified that after Ms. Cruz opened the door, Sgt. Arahovites explained to her that they were looking for the defendant.  I:13,8-17; II:8,18-21.  The same two officers testified that Ms. Cruz responded that the defendant was not at 15 Brook Street, and that he only came over for sexual favors.  I:13,13-15; II:9,3-6.  According to the same two officers, Ms. Cruz invited them in to look for the defendant.  I:13,16-17; I:15,16-23; II:9,3-16.  They described the conversation between Ms. Cruz and Sgt. Arahovites as "polite" and "cooperative," with "normal tone[s] of voice" and "nobody was shouting."  I:14,8-14; II:10,1-6.

Meanwhile, consistent with this description of the conversation, the third officer, Det. Melanson, testified that he saw the conversation going on at the front door but could not hear any details because he was standing at the back of the porch. III:43,7-14.  He also testified that while he was on the porch, he did not hear any loud voices.  III:14,9-10.  He remembered being on the porch for three to five minutes, similar to Sgt. Arahovites' recollection that the conversation on the porch with Ms. Cruz lasted at least three minutes.  I:67,10-16; III:43,3-6.

All three officers testified that at the end of the conversation on the porch, they entered the house together, with Sgt. Arahovites entering first, Det. Rogers following second, and Det. Melanson third.  I:15,24-16,6; II:9,17-22; III:15,4-14.  Sgt. Arahovites and Det. Rogers both specifically testified that none of

3

the officers entered the house until invited to do so by Ms. Cruz
to look for the defendant.  I:15,19-25; II:9,3-16.  All three
officers stated that their guns were not drawn at any point during
their interactions with Ms. Cruz.  I:13,18-14,7; II:10,17-24;
III:14,15-22.  Nor was testimony elicited from any of the officers,
either on direct examination or cross examination, regarding any
verbal or physical threats against Ms. Cruz while on the porch.

Moreover, Sgt. Arahovites and Det. Melanson both testified
that once inside the house, Sgt. Arahovites had a further
conversation in the kitchen with Ms. Cruz explaining why they were
there.  I:16,7-21; III:39,14-40,18; III:50,24-52,4.  During this
conversation, both Sgt. Arahovites and Det. Melanson testified that
Ms. Cruz again gave them consent to look for the defendant inside
15 Brook Street.  I:16,18-21; III:50,24-52,4.[2]

The officers' testimony regarding their interactions with Ms.
Cruz on the porch of 15 Brook Street is not only consistent with
each other, it is largely consistent with their earlier statements
as well.  Apart from their obvious mistake regarding the search and
seizure waiver form, a mistake that they testified was due to lack
of preparation, the officers recounted substantially similar facts
about the porch conversation under oath in July that they recounted

---

[2]Det. Melanson remained firm in his recollection of this
second conversation in the kitchen, even when it was suggested to
him on cross examination that Sgt. Arahovites had testified that
no such conversation occurred.  III:50,24-52,4.  The record
indicates that Sgt. Arahovites in fact testified at some length
about the second conversation inside the house.  I:16,18-21.

to the USAO and ATF in April during pre-hearing meetings, in May on
the original date of the suppression hearing, and in June after the
suppression hearing was postponed.  Govt. Opp'n. Mot. 2-3; <u>see
also</u> Govt. Revised Opp'n. Mot. 3-4, 11-13.

## II.   THERE IS NO EVIDENCE THAT THE OFFICERS COORDINATED THEIR TESTIMONY

The defendant may suggest that the only reason the officers
have relatively consistent recollections of their interactions on
the porch with Ms. Cruz is that they coordinated their testimony on
the morning of May 18th to bolster their case.[3]  However, any such
accusations are without merit.  Had the officers coordinated their
testimony to bolster their case, then surely Det. Rogers and Sgt.
Arahovites would have agreed on whether the conversation with Ms.
Cruz took place on the porch with the screen door open or closed.
Instead, they gave conflicting recollections of that detail.
I:10,14-20; II:8,2-6.  Likewise, had they coordinated their
testimony to bolster their case, then surely they would have agreed
whether Det. Rogers was standing to the left of Sgt. Arahovites on
the porch, or to the right.  Again, they gave conflicting
recollections of that detail.  I:10,14-20; II:7,10-13.  In short,
while their recollections are substantially similar, there are

---

[3]In particular, the defendant seemed to suggest during cross
examination that it was the unexpected appearance of Ofr. Fred.
Corthell at the USAO on May 18 that caused Sgt. Arahovites, Det.
Rogers, and Det. Melanson to coordinate their testimony.
However, all three officers testified that the presence of Ofr.
Corthell was of little concern to them. I:43,23-44,9; II:46,2-
48,2; III:26,18-27,24.

5

enough inconsistencies between them to rebut any accusation that they coordinated their testimony to bolster their case.

### III. THE TESTIMONY OF THE OFFICERS REGARDING THE CONVERSATION ON THE PORCH IS CREDIBLE EVEN IN LIGHT OF OTHER INCONSISTENCIES

Alternatively, the defendant may argue that there are so many inconsistencies in the officers' recollections about other issues in this case that they cannot be trusted when it comes to their recollections of their interactions on the porch with Ms. Cruz. No doubt the defendant will refer to many of these inconsistencies in his memoranda. But the government reiterates that with respect to the conversation with Ms. Cruz on the porch, the officers recounted substantially similar facts under oath in July that they recounted in April, May and June. See supra, p.5.

Moreover, it is critical to note that from March 10, 2005, until April of 2006 at the earliest, Sgt. Arahovites, Det. Rogers, and Det. Melanson did no work on this case. I:75,11-18; III:4,12-5,1; III:44,18-25. They were not the assigned case officers; rather, on March 10, 2005, they simply did a favor for Sgt. Burrill, a sergeant in an entirely different unit. I:7,15-8,11; II:4,19-5,10; III:12,13-13,2. They had one job: to go to 15 Brook Street and arrest the defendant. I:49,12-16. Their recollections about what they did before they arrested the defendant are substantially consistent, with the obvious exception regarding the search and seizure waiver form, which they explained was due to lack of preparation. To the extent that there are inconsistencies

6

about what happened *after* they arrested the defendant, such
inconsistencies deal with events that occurred after they had
completed their assigned job.  While far from exemplary police
work, this explains why, for example, Sgt. Arahovites could not
recall personally seeing Det. Rogers recover ammunition from the
couch in the basement.  I:73,13-22.

**IV.  MS. CRUZ'S TESTIMONY IS NOT CREDIBLE**

At any rate, the version of events offered by Ms. Cruz in
support of the defendant suffers from at least four distinct flaws
that render her testimony untrustworthy.

### 1.  <u>Ms. Cruz's Testimony Regarding The Number And Location of Officers Is Not Credible</u>

Ms. Cruz repeatedly testified that only two officers entered
her house, with one staying by the front door and asking her
questions, and the other going down to the basement.  IV:11,22-25;
IV:14,23-24; IV:19,20-25; IV:25,25-26,4; IV:26,21-27,2.  First of
all, this directly contradicts the fact that at all times there
were at least 3 officers inside 15 Brook Street, a fact that even
the defendant himself apparently concedes.  Def. Mot., Ex.D, ¶ 4.
In addition, according to Ms. Cruz's testimony, if only two
officers entered her house, with one in the kitchen and one going
down to the basement, then any other officers must necessarily have
stayed outside the house and outside her field of vision.  From an
officer safety perspective, the notion that one or more officers
would remain outside or near the front entrance to 15 Brook Street

while allowing their fellow officer to descend into the basement to search for a shooting suspect, without any assistance or protection, simply does not make sense.

### 2. __Ms. Cruz's Testimony Regarding A Radio Call For A Search Warrant Is Not Credible__

A second reason why Ms. Cruz's testimony is not credible relates to her recollections about a request for a search warrant. Ms. Cruz stated both in her affidavit and in her testimony that she heard one of the officers request a search warrant over the radio. Def. Mot., Ex. E, ¶ 7; <u>see</u> <u>also</u> IV:28,12-29,17. However, this testimony directly contradicts the audio tape of police radio calls that was entered into evidence, on which there was no mention whatsoever of a search warrant. III:59,14-17.

### 3. __Ms. Cruz Admitted That She Lied To Law Enforcement__

A third reason why Ms. Cruz's testimony is not credible is that one of the first things she did in her interactions with the police was lie. By everyone's account, including Ms. Cruz's, one of the first things the officers asked her was whether the defendant was inside the house. And by everyone's account, including Ms. Cruz's, she responded that he was not there. Ms. Cruz testified that she knew then that her response to the officers' question was not true. IV:27,25-28,8. In short, where the defendant is involved, Ms. Cruz has a track record of lying to law enforcement.

### 4. __There Are Critical Differences Between Ms. Cruz's Testimony__

### And Her Sworn Affidavit

The fourth reason why Ms. Cruz's testimony is not credible relates to a critical difference between her affidavit and her testimony.  In her affidavit, she stated that she heard a knock on the door and then heard someone on the other side of the door identify themselves as "maintenance."  Def. Mot., Ex. E, ¶ 3.  In her testimony, however, she stated that she heard a knock on the door and then heard someone say "say it's maintenance."  IV:11,8-11; IV:22,4-10.

While this difference may at first blush seem innocuous, it is in fact highly damaging to Ms. Cruz's credibility.  The affidavits submitted by Ms. Cruz and the defendant, signed under penalty of perjury, were fatally irreconcilable with each other because neither offered any credible reason why the defendant ran downstairs and hid under rags.  Looking specifically at Ms. Cruz's affidavit, the Court would have been left with one of two conclusions, each of which would have been equally unbelievable.  First, the Court could believe that there was a knock on the door, someone said "maintenance," the defendant ran downstairs, and then Ms. Cruz opened the door, in which case the Court would have to conclude the defendant feared people who identified themselves as maintenance.  Alternatively, the Court could believe that there was a knock on the door, someone said "maintenance," Ms. Cruz opened the door and saw three police officers with badges and *then* the

9

defendant ran downstairs.  In that case, the Court would have to conclude that none of the three officers saw or heard the defendant run down the basement stairs, which are located in the kitchen a few feet from the front door.

Neither of those conclusions are reasonable.  Ms. Cruz attempted to resolve this fatal flaw on the witness stand by contradicting her affidavit and testifying that she heard the people on the other side of the door say "say it's maintenance," as opposed to simply identifying themselves as maintenance.  However, in light of this critical difference between Ms. Cruz's affidavit and her testimony, the only credible explanation why the defendant ran downstairs and hid under rags is that the officers properly identified themselves as policemen when they knocked on the door. That explanation stands in direct contradiction to Ms. Cruz's testimony that she opened the door expecting to see maintenance men.  IV:24,10-11.  But it is entirely consistent with the testimony of all three of the officers.

**CONCLUSION**

The officers' performance in this case was far from exemplary, but their testimony is nonetheless credible.  Accordingly, the defendant's motion to suppress should be DENIED.

                         Respectfully submitted,
                         MICHAEL J. SULLIVAN
                         United States Attorney
                    By:  /s/ S. Waqar Hasib
                         S. WAQAR HASIB
                         Assistant U.S. Attorney

10