United States District Court
District of Massachusetts

```
                                 )
UNITED STATES OF AMERICA,        )
                                 )
          v.                     )
                                 )    Criminal No.
GEORGE L. MEDINA,                )    05-10213-NMG
                                 )
          Defendant.             )
                                 )
```

## MEMORANDUM & ORDER

### GORTON, J.

The defendant, George L. Medina ("Medina"), a/k/a Jorge L.
Medina, is charged with unlawful possession of ammunition by a
felon. He now moves to suppress the fruits of an allegedly
illegal search of his home and statements he made to the police
subsequent to the search. The government opposes that motion.

## I.   **Background**

### A.   **Undisputed Facts**

On August 24, 2005, the government filed a criminal
complaint against Medina charging him under 18 U.S.C. § 922(g)(1)
with one count of unlawful possession of ammunition by a felon.
The indictment states that Medina, having previously been
convicted of a crime punishable by imprisonment for a term
exceeding one year, did possess in or affecting commerce

-1-

ammunition, specially 89 rounds of .22 caliber ammunition bearing head stamp "C". The defendant, a resident of Haverhill, Massachusetts, pled not guilty during an initial appearance and arraignment before Magistrate Judge Bowler on September 21, 2005. The defendant now moves to suppress any and all evidence derived from an allegedly unlawful police search of his girlfriend's residence at 15 Brook Street, Haverhill that took place on March 10, 2005, as well as subsequent inculpatory statements he made to officers of the Haverhill Police Department ("the HPD") on that same day.

At the heart of the dispute between Medina and the government is a fundamental disagreement about the factual background of Medina's arrest on March 10, 2005. According to the government, on March 9, 2005, officers from the HPD responded to a call of shots fired at 2 Hancock Street, Haverhill. At that location, officers found a victim suffering from two gunshot wounds and a .22 caliber bullet in the kitchen. Later that evening, the HPD received an anonymous phone call from a woman stating that the shooter was Medina. The HPD received similar information from the Massachusetts State Police and the Methuen Police Department, including information that Medina might be found at the house of his girlfriend, Jacqueline Cruz ("Cruz"), at 15 Brook Street, Haverhill.

On the morning of March 10, 2005, HPD Sergeant Dana Burrill

-2-

("Burrill") of the Investigative Detectives Unit, who had received the anonymous call about Medina the prior evening, learned of an outstanding arrest warrant on Medina for driving a car with a suspended license. Due to the short-staffing in his own unit, Burrill sent three HPD officers assigned to the Narcotics Unit to 15 Brook Street. Around 10:00 a.m., Sergeant John Arahovites ("Arahovites"), Detective Gary Melanson ("Melanson") and Detective Robert Rogers ("Rogers") arrived at 15 Brook Street in an unmarked police vehicle and in plain clothes, although at least one officer had his badge displayed.[1]

## B.   Government's Factual Allegations

It is at that critical point that the government's version of events departs significantly from the one proffered by Medina. Specifically, the government alleges that Sergeant Arahovites knocked on the front door of 15 Brook Street. Detective Rogers was standing beside Arahovites while Detective Melanson was standing behind the other officers towards the back of the entry way. The men allegedly identified themselves as law enforcement officers. A woman opened the door. The officers asked if she

---

[1] The HPD officers could not accurately pinpoint the time of their arrival at 15 Brook Street. At the suppression hearing, Sergeant Arahovites testified that the officers arrived at the premises around 9:30 a.m. but Detective Rogers indicated that their arrival was probably between 10:00 and 10:30 a.m. before he admitted he had no recollection of when the officers arrived at Cruz's home. The HPD communications officer, Fred Corthell, later testified that the call from the on-site officers reporting that they had someone under arrest came at 10:26 a.m.

was Jacqueline Cruz and the woman replied affirmatively.

According to the government, the officers continued to speak with Cruz from outside the house. They told her that they were looking for Medina and asked if he was in the house. Cruz replied that he was not, that he had not been to the house in over a month and that he only paid her visits when he was seeking sexual favors. Arahovites then asked Cruz if he and the other officers could come inside to look for Medina and Cruz allegedly told them they could do so. At that point, Cruz apparently opened the door wide and invited the officers to walk into the house.

In the government's first opposition to Medina's motion to suppress, it stated that, when Arahovites and Melanson entered Cruz's home, Detective Rogers immediately returned to his car to retrieve a search and seizure waiver form and then entered the house after his colleagues. The government asserted that Arahovites and Melanson then went into the kitchen with Cruz and asked her to sign the consent form. The form authorizes the "Haverhill Police Department to conduct a complete search of my residence located at 15 Brook St Haverhill." According to the government, Cruz signed the form as did Arahovites and Melanson, who added the date (3/10/05) and time (10:45 a.m.) next to their signatures.

According to the government, while Cruz was signing the

-4-

consent form, Rogers approached a doorway in the kitchen leading downstairs into the basement. Rogers asked Cruz if he could go down the stairs and she assented. When Rogers went down into the basement he did not see anyone, but he walked to a door at the rear of the basement, opened it and went into a utility hallway behind the basement. At one end of the hallway there was another door leading outside and at that end of the hallway Rogers saw someone lying on the floor underneath some rags.

After a brief struggle, Rogers handcuffed the man, whom he recognized as Medina, and led him from the utility hallway back into the basement. The officers then radioed dispatch to confirm the outstanding warrant against Medina and, upon confirmation, placed Medina under arrest.

Also in its first opposition, the government asserted that Medina asked the officers to have Cruz bring him his shoes and the officers complied. Medina then asked to sit down on a small sofa in the basement to put on his shoes. Before Medina sat down, Rogers looked beneath the seat cushion of the sofa where Medina wanted to sit and found a pellet gun and six rounds of .22 caliber ammunition in a plastic bag. Rogers removed the items from Medina's reach and then allowed Medina to sit down on the sofa.

According to the original opposition, after Cruz delivered Medina's shoes, Rogers noticed another bullet tied to the

-5-

shoelace of one of the shoes. That bullet was later identified as .22 caliber. At the same time, Rogers noticed a box of bullets at the foot of the staircase opposite the couch. The box was transparent and had a label indicating that it contained .22 caliber bullets. Rogers seized the box.

Medina was transported to HPD, advised of his Miranda rights and booked. According to the government's first opposition, Medina admitted that the bullets in the bag, the bullets in the box and the bullet tied to his shoelace belonged to him. He also admitted that he always carries six bullets in a bag with him.

## C.   Defendant's Factual Allegations

Medina and Cruz offer a starkly different version of the events that took place on March 10, 2005. According to Medina, he had spent the night at Cruz's residence at 15 Brook Street, Haverhill on March 9, 2005, and was still there when the police arrived on the morning of March 10, 2005. Cruz testified that on that morning, she was summoned to her front door by a knock. At the time, Cruz says that her five-year-old daughter was at home sitting on the couch in the living room and that when she asked who was at the door, the people on the other side said "maintenance". Upon opening the inside door part way, Cruz contends that she saw two police officers. The lead officer was holding the screen door open and wedged his foot between the inside door, which she had just opened, and the door frame,

-6-

thereby preventing her from closing the door.

Cruz contends that the lead officer, who was leaning forward, asked her if "George" was in the house. Immediately after she replied that he was not, the lead officer moved into the house while talking to her about Medina's brother. Cruz asserts that she did not invite the officer into her home. Meanwhile, Cruz saw the second officer enter her home after the lead officer but then lost track of him.

While the lead officer was speaking to Cruz at her bedroom doorway and peeking into her bedroom, he allegedly asked her if he could look for "George". Cruz claims that she concluded she had no choice but to permit the search and to acquiesce to the request. She contends, however, that when she gestured towards the bedroom and told the officer, "You can see for yourself he's not here," she was limiting her consent to a search of the bedroom only.

It was at that point that Rogers (who had gone past Cruz and down into the basement) found Medina in the utility room. Medina claims that they handcuffed him, brought him back into the main basement and sat him down on the stairs which led to the first floor of the house. At that point, Medina asserts that the officers commenced to scour every corner of the basement, pulling insulation down from the ceiling and tossing aside seat cushions from the furniture, none of which was done with the consent of

-7-

either Medina or Cruz. During the search, Medina contends that the officers questioned him, repeatedly demanding, "Where is the gun, we know you have a gun!" After discovering ammunition tucked under the stairway and under a seat cushion, Medina claims that the officers interrogated him about the ammunition although he had not yet been advised of his Miranda rights.

Cruz testified that the police were in her basement for approximately ten minutes after which they returned to the first floor with Medina in handcuffs. At that point, Cruz claims the officers told her they had found ammunition in the basement and asked her to get Medina a pair of shoes. Before Medina was removed from her home, a detective and a uniformed officer presented her with a standardized "consent to search" form. According to Cruz, the officers informed her that if she signed the form they would refrain from informing the housing authority that Medina had stayed overnight at her home. Cruz claims that she signed the form because of her fear of the consequences of a refusal.

## D.    Material Alterations to the Government's Factual Allegations

The hearing on Medina's motion to suppress was originally scheduled for May 18, 2006. Shortly before that hearing, during witness preparation interviews, the government learned of new and potentially exculpatory evidence regarding the signed Consent Search Waiver form. Specifically, Sergeant Arahovites and

-8-

Detective Rogers both indicated that they were mistaken about
when the form was signed by Cruz. In their earlier statements,
the officers had asserted that Cruz consented to the search and
signed the form just after they entered the home and before
Medina was discovered. During the witness preparation interviews
on May 18, 2006, Arahovites and Rogers became concerned that
their memories were mistaken when they noticed on the form the
time of the witnessing officers' signatures (10:45 a.m.). It was
at that point that Arahovites concluded that their previous
statements had been incorrect and that the consent form had been
signed only after Medina had been discovered in Cruz's home.

The government informed defense counsel of the potentially
exculpatory evidence and both sides requested a continuance of
the hearing to evaluate the new information that had been learned
that morning. The Court granted a continuance and a hearing was
ultimately held on July 11, 2006.

In the interim, the government re-interviewed its officer
witnesses to examine the new evidence relating to the Consent
Search Waiver form. Arahovites and Rogers admitted their
inaccurate prior statements concerning the form and both officers
placed the blame for the misstatements on their lack of
preparation in advance of the scheduled suppression hearing on
May 18, 2006.

-9-

## II.  **Discussion**

### A.  **Medina's Standing**

Medina attacks the search of Cruz's residence on many
fronts.  The first and most significant hurdle he must overcome
is his standing to challenge the search at all.  The Supreme
Court has held that the

> capacity to claim the protection of the Fourth Amendment
> depends ... upon whether the person who claims the
> protection of the Amendment has a legitimate expectation of
> privacy in the invaded place.

Minnesota v. Olson, 495 U.S. 91, 95 (1990)(quoting Rakas v.
Illinois, 439 U.S. 128, 143 (1978)).  An individual's "subjective
expectation of privacy is legitimate if it is one that society is
prepared to recognize as reasonable".  Id. at 95-96 (internal
quotations and citations omitted).  In Olson, the Supreme Court
established that overnight guests have a legitimate expectation
of privacy in their host's home.  Id. at 98.  See also United
States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004)(finding that a
defendant who was a "fairly regular overnight guest" in a third
party's apartment fell "squarely within the rule that an
overnight guest has a legitimate expectation of privacy in his
host's abode").

Despite the fact that Medina was an overnight guest and he
had an expectation of privacy in Cruz's home, the government
argues that such an expectation was illegitimate.  Specifically,
the government, in its written opposition, points out that Cruz's

-10-

lease with the Haverhill Housing Authority authorizes only her
occupancy and that

> no other person may occupy the leased premises overnight for
> more than a total of twenty-one (21) nights in any twelve
> (12) month period without [the housing authority's] consent.

Furthermore, Section X(13) of the lease states that the housing
authority can terminate the lease if a guest stays overnight at
the house more than a total of 21 nights per year.  Assuming that
Medina stayed at Cruz's home more than 21 days between March 10,
2004, and March 10, 2005, in light of his claim that he was
"often ... a welcome overnight guest" at Cruz's home, the
government contends that Medina's subjective expectation of
privacy is not legitimate because, according to the terms of the
housing authority policy, it is not one that society is prepared
to recognize as reasonable.

The government's argument is novel but there is no caselaw
in its support and the government presented no evidence at the
suppression hearing to establish a violation of Cruz's lease, so
this Court will follow the traditional view that Medina had a
legitimate expectation of privacy in Cruz's home as an overnight
guest and, therefore, has standing to challenge the search.

**B.   Reasonableness of the Warrantless Search of Cruz's Home**

Medina argues that the warrantless search of Cruz's home was
per se unreasonable and violated his Fourth Amendment Rights.

-11-

### 1.  Burden of Proof

When the police act without a warrant, the burden of proof
is on the government.  United States v. Melendez, 301 F.3d 27, 32
(1st Cir. 2002).  There are certain kinds of Fourth Amendment
issues which customarily receive special treatment with respect
to burden of proof.  One of them is the so-called consent search.
The Supreme Court has held:

> When a prosecutor seeks to rely upon consent to justify the
> lawfulness of a search, he has the burden of proving that
> the consent was, in fact, freely and voluntarily given.
> This burden cannot be discharged by showing no more than
> acquiescence to a claim of lawful authority.

Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).

### 2.  Analysis

In Steagald v. United States, 451 U.S. 204 (1981), the
Supreme Court held that, in the absence of valid consent or
exigent circumstances, warrantless searches are per se
unreasonable and violate the Fourth Amendment.  Id. at 211.
Here, the only warrant the police possessed at the time they
entered Cruz's home was an old warrant for Medina's arrest for
driving a car with a suspended license.  In Steagald, the Supreme
Court stated that an arrest warrant for a non-resident was
insufficient to authorize a search of a third party's home.  Id.
at 216.  Operating under the premise that the police did not have
valid consent or exigent circumstances to search Cruz's home,
Medina contends that the search by the HPD violated the principle

-12-

stated in Steagald.

The government responds that Medina's premise is faulty. Specifically, it argues that Cruz freely and voluntarily gave her consent to the police officers to search 15 Brook Street, thereby legitimizing the search. See United States v. Laine, 270 F.3d 71, 74-75 (1st Cir. 2001). Medina counters that Cruz never gave consent to search to the HPD officers and the limited consent she did give was the product of coercion and intimidation.

Consent is not voluntary if it is merely the acquiescence to a claim of lawful authority. Bumper, 391 U.S. at 548-49. Moreover, "[w]here there is coercion, there cannot be consent." Id. at 550. Consent must be voluntary and courts look to several factors in order to determine whether consent was given voluntarily or through coercion. United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993). Those factors include age, education, experience, intelligence, knowledge of the right to withhold consent and evidence of coercive means or inherently coercive circumstances. United States v. Corain, 198 F.3d 306, 309 (1st Cir. 1999). No one factor is determinative because the Court must examine the totality of the circumstances surrounding the purported consent. Barnett, 989 F.2d at 554-55.

Here, Medina argues that those factors militate against a finding that Cruz's consent to search was freely and voluntarily given to the police. At the time of the incident, Cruz was 31

-13-

years old and the single mother of three young children.  She had little previous contact with police officers.  Medina contends that the police conveyed the message to Cruz that she had no right to resist them when one officer prevented her from closing the front door and backed her into her living room while another officer entered her home and began searching without permission. Moreover, Medina submits that 1) Cruz never gave verbal consent to search her home before he was discovered and arrested and 2) even if Cruz gave any consent to search, it was limited to her bedroom.

The government responds that Cruz's consent was entirely voluntary.  In its version of the facts, Cruz: 1) allowed the police into her home to look for Medina, 2) voiced no reservations about their entry either before or after it occurred and 3) exhibited no signs in her demeanor or physical conduct that she felt coerced.

Ultimately, this Court cannot resolve the legal issues in this case without resolving the fact dispute which arises between the HPD officers and Cruz.  The critical issue is, and always has been, whether the officers had valid consent to enter 15 Brook Street to look for Medina.  It is the government's burden to show, by a preponderance of the evidence, that Cruz gave her consent to search freely and voluntarily.  When, as here, the Court is confronted with two divergent accounts of the critical

-14-

events at issue, the Court, as the finder of fact, may weigh the credibility of the witnesses. See United States v. Kimball, 741 F.2d 471, 474 (1st Cir. 1984)("The issue of credibility is appropriately addressed to the trial court as finder of fact.")(citation omitted).

It is when the Court embarks on such an examination that the HPD officers' suspect credibility assumes great importance. First, the material alteration to their first explanation as to when Cruz signed the Consent Search Waiver form causes grave concern. Although the government correctly notes that the HPD officers should be commended for alerting the defendant and the Court to their misrecollections regarding the consent form, it nevertheless rattles the Court's confidence that they have accurately remembered other important details about the events of March 10, 2005.

That confidence was not restored during the three-day suppression hearing. The Court heard testimony from the four principal HPD officers in this case (Arahovites, Rogers, Melanson and Burrill) and each version was confusing, disjointed and often contradictory of the others. For example, with respect to the issue of verbal consent, Sergeant Arahovites made no mention of verbal consent when he spoke with an Assistant United States Attorney and ATF agent in April, 2006. In May, he provided an elaborate account of verbal consent in which he talked with a

-15-

"calm" Cruz "through the screen door" on her porch. In June, Arahovites told his interviewers that Cruz's voice was "a little raised" when he spoke to her and that the screen door was open when he did so. In July, he testified that he had explained the purpose of the police presence to Cruz "in the foyer", although, in prior accounts, he indicated that conversation had taken place while he was still outside.

Among other disturbing inconsistencies in the officers' version of events:

1)  none of the officers seems to agree on when or how the arrest warrant was confirmed;

2)  Rogers stated in May, 2006, that Arahovites had advised Medina of his <u>Miranda</u> rights in the basement of 15 Brook Street but at the suppression hearing testified that no one advised Medina of his rights at the premises;

3)  irreconcilable testimony of the officers about which of them were in the basement and whether ammunition and/or the pellet gun was in plain view;

4)  whether Rogers saw, or didn't see, a bullet tied to one of the laces of Medina's sneakers in the basement;

5)  whether Melanson heard or didn't hear any conversation at the entry way on March 10, 2005, and whether the officers were inside or outside when Cruz allegedly verbally consented to a search; and

6)  total confusion as to when and under what circumstances the consent form was signed.

Although those misstatements and inconsistencies concern a variety of issues, some more critical to the present inquiry than others, the aggregate seriously degrades the credibility of the

-16-

officers' recollections of the events of March 10, 2005. By the Court's estimate, the HPD officers in this case have provided at least three different versions of the timing and circumstances of the written consent and, with respect to the timing and circumstances of the alleged verbal consent, Arahovites has provided three different versions and Rogers at least two. The sheer multiplicity of materially different accounts from the government's own witnesses makes it impossible for the Court to credit one version against another.

Medina implies an element of bad faith in the HPD officers' alteration of their version of events, namely that the officers' sudden reliance on (and description of) verbal consent as justification for their search was a tactical alteration born of necessity. The Court, on the other hand, declines to ascribe to malice that which can be explained by incompetence.

In contrast, Cruz has provided a relatively consistent version of the events that took place at 15 Brook Street. The government challenges her credibility by attacking her testimony with respect to the number and location of officers at her home and the differences between her testimony and her sworn affidavit. As to the former, Cruz remembers only two officers initially entering her home while three officers actually did so. However, if, as she testified, Cruz was engaged in forced conversation at her bedroom doorway with the lead officer, it is

-17-

not surprising that she failed to remember the entrance of the
third officer. As for the alleged "critical" differences between
Cruz's testimony and her affidavit, the government relies on the
innocuous distinction that in one she stated that the voice
following the knock at her door said "maintenance" while in the
other she testified that the voice said "say it's maintenance."
Such a trivial distinction highlights the feebleness of the
government's argument.[2]

Having found Cruz's testimony more credible and reliable
than that provided by the government's witnesses, the Court
concludes that the facts of this case are more egregious than
those presented by United States v. Weidul, 325 F.3d 50 (1st Cir.
2003)(affirming district court's holding that verbal consent by
defendant's fiancee was involuntary where, after defendant was
transported to hospital, officer re-entered house without
permission and conducted a search in the fiancee's presence, but,
for the most part, without her audible consent to search
particular rooms). Here, Cruz did not consent to the police
searching any part of her home except perhaps the bedroom.[3] In

_____

[2] The government's reference to Cruz's "track record of
lying to law enforcement" is apparently limited to her lie that
Medina was not in her house on March 10, 2005, when, in fact, he
was. Cruz admitted to that false statement and the Court is
unaware of any other documented mistruths.

[3] It remains unclear whether Cruz's consent to search her
bedroom was freely and voluntarily given to the police or was
acquiescence to authority. For the Court's purposes here, it

-18-

Weidul, the police made a pretense of consulting the fiancee about her wishes as they searched her home while, in this case, they did as they pleased without obtaining her approval until after the discovery of Medina and the contraband.

This case is distinguishable from other voluntary consent cases cited by the government. See United States v. Cepulonis, 530 F.2d 238 (1st Cir. 1976)(upholding search and finding that defendant's consent was voluntary where he 1) was arrested at gunpoint outside his hotel room, 2) asked to return to his room and 3) was asked by agents whether any weapons were hidden in the room, to which he replied, "No, go ahead, search."). See also United States v. Winston, 444 F.3d 115, 121-22 (1st Cir. 2006)(overturning district court's suppression of evidence under facts similar to Cepulonis). Unlike our case, the consenting individual in Cepulonis had a prior history of violence and had confronted the police before, was on notice of his right to refuse to cooperate with the police and gave explicit, verbal consent to the search. The First Circuit's holding in Winston is also inapposite because, in that case, the court found that the consenting individual had given implied-in-fact consent through his gestures to the police. Although unlocking and opening a

---

makes little difference because, even if Cruz's consent was voluntary, "the scope of the search is limited by the terms of its authorization." Walter v. United States, 447 U.S. 649, 657 (1980). Thus, in this case, the lead officer, at most, had consent to search Cruz's bedroom, not the rest of the house.

door for police and then walking back into a room voluntarily can constitute implied-in-fact consent, see Robbins v. MacKenzie, 364 F.2d 45, 48 (1st Cir. 1966), in this case Cruz opened the door because the voice on the other side told her it was "maintenance" and her decision to move back from the door was due to the lead officer "walking and talking" as he pushed into the foyer.

In accordance with the foregoing analysis, the Court concludes that the HPD officers violated Medina's Fourth Amendment rights when they conducted an unconsented search of Cruz's home on March 10, 2005.

## C.   Fruits of the Poisonous Tree

Generally, evidence obtained as a result of a violation of a defendant's Fourth Amendment rights, the so-called fruit of the poisonous tree, may not be used against him. See Wong Sun v. United States, 371 U.S. 471, 484 (1963). There are exceptions to that general rule, including independent source and inevitable discovery, see Nix v. Williams, 467 U.S. 431, 443-44 (1984), but the government has raised neither of those concepts, nor any other, to avoid suppression of the fruits of the illegal search of Cruz's home. Thus, the Court will suppress all evidence that was discovered in Cruz's home on March 10, 2005.

The fact that Cruz signed the consent form after the search had taken place does not alter that conclusion because a consent form executed after a search has ended cannot breathe legal life

into an otherwise unlawful and unjustified search. United States v. Matthews, 2006 WL 1581574, at *7 (D. Mass. 2006). Another session of this Court has held that

> [w]hen consent follows an illegal act by the police ... the requirement that consent be voluntary is supplemented by a second distinct requirement: that the consent be purged of the taint of the earlier illegal act.

United States v. Goodrich, 183 F. Supp. 2d 135, 145 (D. Mass. 2001). To be admitted, the evidence must be so distanced from the underlying illegal police conduct "as to dissipate the taint of the illegal search or seizure." Id. Cruz gave her written consent immediately after she was confronted with a handcuffed Medina and the discovered contraband and there were no intervening circumstances to distance her consent from the taint of the search, thus her written consent was tainted.

Medina's inculpatory statements which he made at the police station after his arrest must also be suppressed. The validity of a confession depends on whether it was an act of free will under the totality of the circumstances. Brown v. Illinois, 422 U.S. 590, 603 (1975). The temporal proximity of the illegal conduct to the arrest, the presence of intervening circumstances and the purpose and flagrancy of the official misconduct are all relevant to that analysis. Id. at 603-04. The burden of showing admissibility rests on the government. Id. at 604.

Here, Medina's inculpatory statements were not sufficiently detached from the illegal search of Cruz's home to be an

untainted act of free will. Although Miranda warnings are an
important factor in the Court's analysis of attenuation, see
United States v. Paradis, 351 F.3d 21, 34 (1st Cir. 2003),
Medina's statements were made shortly after the illegal search of
Cruz's home and his arrest and, therefore, the Miranda warnings
did not remove the taint from his statements.[4] See id. (finding
that defendant's statements were sufficiently attenuated from an
illegal search where statements were made after Miranda warnings
but where 1) police had additional evidence independent of their
illegal search and 2) seven days had passed between the illegal
search and the police questioning of the defendant); United
States v. Torres, 274 F. Supp. 2d 146, 159 (D.R.I. 2003)(finding
statements made at police headquarters three or four hours after
an illegal search of a home were not sufficiently attenuated from
the illegal conduct to be admissible even though defendant had
received Miranda warnings).

---

[4] It is unclear exactly how much time passed between the
illegal search and the questioning of Medina at the police
station but it appears from the evidence that it was
substantially contemporaneous.

**ORDER**

Defendant's Motion to Suppress Fruits of Illegal Search of Home and Statements (Docket No. 17) is **ALLOWED.**

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated August 17, 2006